STATE OF CONNECTICUT *v.* MARK REID
(SC 15904)

McDonald, C. J., and Borden, Palmer, Sullivan and Vertefeuille, Js.

Argued April 26—officially released September 5, 2000

*Fiona Greaves*, with whom were *Charles D. Ray* and, on the brief, *Peter W. Hull*, for the appellant (defendant).

*Robert M. Spector,* deputy assistant state's attorney, with whom, on the brief, were *James E. Thomas,* state's attorney, and *Vicki Melchiorre,* senior assistant state's attorney, for the appellee (state).

*Opinion*

MCDONALD, C. J. After a jury trial, the defendant, Mark Reid, was convicted of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (1)[1] and kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (A),[2] and the trial court rendered judgment in accordance with the verdict. The defendant appealed from the judgment to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

On appeal, the defendant claims that the trial court improperly: (1) admitted expert testimony relating to microscopic hair analysis; (2) denied the defendant's motion to suppress the victim's out-of-court identification of him in a photographic array; and (3) marshaled the evidence at the close of the trial. We reject each of the defendant's claims, and accordingly, affirm the judgment.

The jury reasonably could have found the following facts. In the early morning hours of November 8, 1996, the victim walked from a bar in East Hartford to her home, which was also in East Hartford. While the victim

---

[1] General Statutes § 53a-70 provides in relevant part: "(a) A person is guilty of sexual assault in the first degree when such person (1) compels another person to engage in sexual intercourse by the use of force against such other person or a third person, or by the threat of use of force against such other person or against a third person which reasonably causes such person to fear physical injury to such person or a third person . . . ."

[2] General Statutes § 53a-92 provides in relevant part: "(a) A person is guilty of kidnapping in the first degree when he abducts another person and . . . (2) he restrains the person abducted with intent to (A) inflict physical injury upon him or violate or abuse him sexually . . . ."

was walking along Burnside Avenue, the defendant emerged from a path leading out of Martin Park and, after asking the victim for a light, grabbed her by the left wrist. The defendant pushed a sharp object into the victim's side and forced her approximately seven feet down the path into Martin Park. A struggle ensued between the victim and the defendant, and they both fell to the ground. The defendant put his hands around the victim's neck to quiet her screams and threatened to kill her. The defendant then carried the victim further along the path into Martin Park, and pushed her to the ground. The defendant straddled the victim and placed his knees upon her arms. The defendant began to choke the victim, with one hand on her nose and mouth and the other around her throat, and again threatened to kill her. The victim began to lose consciousness and, out of fear for her life, decided to stop struggling. The defendant then forced the victim to perform fellatio. He then placed a condom on his penis, turned the victim onto her front side and forced her to engage in vaginal intercourse. The defendant then pulled the victim to her feet and held her by her arm. After the victim pulled up and buttoned her pants, the defendant again threatened to kill her. The defendant continued to hold the victim by the arm, and in this manner forced her along the path toward Burnside Avenue. The defendant let go of the victim, and she walked to her home along Burnside Avenue. When the victim arrived home, she called a friend and told the friend that she had been raped. The victim then hung up and called the police. Officer Brian Fox of the East Hartford police department was dispatched to the home of the victim, and spoke with her about the assault. Fox took the victim to Manchester Hospital, where he secured as evidence her clothes and a screwdriver that she surreptitiously had picked up at the scene of the attack. The victim became increasingly upset, and elected not to be exam-

ined at the hospital. Fox then took the victim home. Because the victim was so upset, Fox did not take a statement from her. Fox did, however, obtain from the victim a description of the attacker, which included the fact that he had freckles across his nose and under his eyes.

On November 12, 1996, at the request of Officer Francis Malozzi of the East Hartford police department, the victim went to the East Hartford police station to give a statement concerning the attack. After the victim gave a statement about the attack, Malozzi showed her a photographic array containing photographs of eight persons that could have fit the description of her attacker. The victim identified the defendant as her attacker, and began to shake and cry. Later that afternoon, Malozzi searched the area where the attack took place and recovered an earring belonging to the victim. Approximately one week later, the defendant was arrested. Additional facts and procedural history will be provided as needed.

I

The defendant makes two claims with respect to the admission into evidence of certain microscopic hair analysis. First, he contends that such evidence was inadmissible per se because it is unreliable and inherently subjective, and second, he argues that, even if not per se inadmissible, the evidence was inadmissible in this case. We disagree.

A

The following additional facts are relevant to the defendant's first claim. After commencement of the trial, the state sought to introduce the testimony of Kiti Settachatgul, lead criminologist at the Connecticut state police forensic laboratory, concerning microscopic hair analysis. The defendant moved to exclude all evidence

regarding hair analysis in this matter and, pursuant to *State* v. *Porter*, 241 Conn. 57, 698 A.2d 739 (1997), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998), requested a hearing as to the reliability of microscopic hair analysis. The trial court held a three day hearing, after which it denied the defendant's motion and admitted the evidence.

Before the jury, Settachatgul testified that he had examined the clothes that the victim was wearing on the night of the attack and recovered three pubic hairs that did not come from the victim. Then, through a process known as microscopic hair analysis, Settachatgul compared these unknown hairs to hairs provided by the defendant. Settachatgul found that the characteristics of the known hairs from the defendant were similar to the characteristics of those recovered from the victim's clothing.

The defendant argues that microscopic hair analysis should be excluded per se under the test adopted by this court in *State* v. *Porter*, supra, 241 Conn. 57, regarding the admission of scientific evidence. In *Porter*, this court followed the United States Supreme Court's decision in *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and held that scientific evidence should be subjected to a flexible test, with differing factors that are applied on a case-by-case basis, to determine the reliability of the scientific evidence. See *State* v. *Porter*, supra, 84–86. *Porter* explicitly stated that the flexible *Daubert* approach was a better approach than the test of general acceptance in the scientific community, which was established in *Frye* v. *United States*, 293 F. 1013 (D.C. Cir. 1923).

In *Porter*, we said that "[a]s science and technology have advanced and become increasingly prevalent in our society, the number of cases, both civil and criminal, in which scientific testimony plays a role has also

grown." *State* v. *Porter*, supra, 241 Conn. 92. We explicitly acknowledged, however, that "some scientific principles have become so well established that an explicit *Daubert* analysis is not necessary for admission of evidence thereunder. . . . Evidence derived from such principles would clearly withstand a *Daubert* analysis, and thus may be admitted simply on a showing of relevance." Id., 85 n.30. As an example of such a principle, this court cited a Montana court's conclusion that a *Daubert* analysis is not necessary for "ordinary fingerprint identification evidence to be admissible." Id., citing *State* v. *Cline*, 275 Mont. 46, 55, 909 P.2d 1171 (1996).

Although this court in *Porter* explicitly adopted the *Daubert* test to determine the admissibility of scientific evidence; see *State* v. *Porter*, supra, 241 Conn. 68; we did not explicitly overrule Connecticut precedent regarding the evidence to which such a test should apply. Prior to *Porter*, this court had recognized that the *Frye* test for admissibility should not apply to all expert testimony, but only to that which involves "innovative scientific techniques . . . ." *State* v. *Borelli*, 227 Conn. 153, 163, 629 A.2d 1105 (1993); *State* v. *Hasan*, 205 Conn. 485, 489, 534 A.2d 877 (1987). In *Porter* we recognized that *Daubert*'s vagueness as to how and when to apply the factors of the test was necessary. *State* v. *Porter*, supra, 78. In order to maintain flexibility in applying the test, we did not define what constitutes "scientific evidence." Id., 78–79. Accordingly, we must examine the expert testimony at issue in the present case to determine whether it is the type of evidence contemplated by *Porter*.

In *State* v. *Hasan*, supra, 205 Conn. 490, we upheld the admission of the testimony of a podiatrist as to the likelihood that a pair of sneakers would fit the defendant's feet. We concluded that the podiatrist's testimony was not "scientific evidence" subject to the *Frye* test because the podiatrist merely compared the foot-

wear to the defendant's feet. Id., 491. Accordingly, the "jury [was] in a position to weigh the probative value of the testimony without abandoning common sense and sacrificing independent judgment to the expert's assertions based on his special skill or knowledge." Id. The testimony was not based on "obscure scientific theories"; id., 491; that had the "potential to mislead lay jurors awed by an aura of mystic infallibility surrounding scientific techniques, experts and the fancy devices employed." (Internal quotation marks omitted.) Id., 490. Rather, the podiatrist's testimony concerned a method, the understanding of which "is accessible to the jury"; id., 491; and the value of the "expertise lay in its assistance to the jury in viewing and evaluating the evidence." Id., 494. Although the podiatrist's skill and training were based on science, the subject to which he testified "was a matter of physical comparison rather than scientific test or experiment." Id., 490; see also *State* v. *Ortiz*, 198 Conn. 220, 227, 502 A.2d 400 (1985) (opinion testimony of forensic odontologist that defendant made bites in partially eaten apple found at scene admissible).

Settachatgul's testimony is akin to that of the podiatrist in *Hasan*. Although Settachatgul's training is based in science, he testified about a subject that simply required the jurors to use their own powers of observation and comparison. During his testimony, Settachatgul displayed an enlarged photograph of one of the defendant's hairs and one of the hairs recovered from the victim's clothing as they appeared side-by-side under the comparison microscope. Settachatgul explained to the jurors how the hairs were similar and what particular features of the hairs were visible. He also drew a diagram of a hair on a courtroom blackboard for the jurors. The jurors were free to make their own determinations as to the weight they would accord the expert's testimony in the light of the photograph

and their own powers of observation and comparison. The jurors were not subject to confusing or obscure scientific evidence, but were able to use the testimony to guide them in their own determination of the similarity of the two hairs.

Other jurisdictions have recognized that a *Daubert* hearing is not required for admission of microscopic hair analysis. The United States Court of Appeals for the Tenth Circuit, in response to the prosecution's claim that the United States District Court had applied the wrong standard in ruling that evidence of microscopic hair analysis was inadmissible, stated that the trial court "incorrectly assessed the issue in evidentiary terms under *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.* [supra, 509 U.S. 579]. Because the court employed the wrong standard, we reverse its ruling that the hair analysis is inadmissible." *Williamson* v. *Ward*, 110 F.3d 1508, 1522–23 (10th Cir. 1997). The Supreme Court of Hawaii also has allowed evidence of microscopic hair analysis to be admitted without a *Daubert* hearing. *State* v. *Fukusaku*, 85 Haw. 462, 474, 946 P.2d 32 (1997). The court made the distinction between scientific knowledge and technical knowledge, the latter being something that "involves the mere technical application of well-established scientific principles and procedures. In such a situation, because the underlying scientific principles and procedures are of proven validity/reliability, it is unnecessary to subject technical knowledge to the same type of full-scale reliability determination required for scientific knowledge." Id., 473. The Supreme Court of Kentucky also determined that microscopic hair analysis was not subject to the *Daubert* test because such evidence had been admitted for many years, and that, by inference, microscopic hair analysis was valid under a *Frye* test. *Johnson* v. *Commonwealth*, 12 S.W.3d 258, 262 (Ky. 1999). Accordingly, the court determined that the trial courts in Kentucky could take judicial notice

that microscopic hair analysis was deemed reliable. Id., 263.

Although we recognize that no Connecticut appellate court previously has held that the technique of microscopic hair analysis is so well established that it does not require a hearing under *Porter* or *Frye*, we note that testimony based on the technique has been admitted in Connecticut courts for many years. See *State* v. *King*, 249 Conn. 645, 656, 735 A.2d 267 (1999) (human hairs found on ski mask were similar to hair samples taken from both victim and defendant); *State* v. *Conn*, 234 Conn. 97, 104–105, 662 A.2d 68 (1995) (hair samples from defendant were not similar to hairs found at scene of crime); *State* v. *Roseboro*, 221 Conn. 430, 435, 604 A.2d 1286 (1992) (hair at scene of crime was microscopically similar to defendant's body hair); *Asherman* v. *State*, 202 Conn. 429, 436, 521 A.2d 578 (1987) (knapsack relevant because it contained hair that was microscopically similar to hair of defendant); *State* v. *Burns*, 173 Conn. 317, 323, 337 A.2d 1082 (1977) (hair at scene of crime similar to hair of defendant and victim).

We conclude that microscopic hair analysis is not the type of evidence that we contemplated in *Porter* to be subject to the *Daubert* test.[3] Accordingly, a hearing as to the admissibility of the evidence was not required by *Porter*, and the trial court properly admitted the evidence.[4] See *State* v. *Porter*, supra, 241 Conn. 85 n.30.

[3] Furthermore, we note that, even if a *Porter* hearing were necessary, the trial court properly conducted the hearing and found that microscopic hair analysis satisfied the *Porter* test because of its general acceptance in the scientific community.

[4] We note that, in *Kumho Tire Co., Ltd.* v. *Carmichael*, 526 U.S. 137, 141, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999), the United States Supreme Court held that a trial court has discretion to apply *Daubert* to all expert testimony, not just that which constitutes "scientific evidence." We need not decide in this case whether to apply *Kumho* in our *Porter* analysis, however, because it would not alter our conclusion that the trial court properly admitted the evidence.

## B

The defendant also claims that the trial court abused its discretion when it admitted the testimony of Settachatgul concerning the microscopic hair analysis because the testimony was not relevant and the proper procedures were not followed in conducting the analysis. We disagree.

" 'Evidentiary rulings will be overturned on appeal only where there was an abuse of discretion and a showing by the defendant of substantial prejudice or injustice.' " *State* v. *McClendon*, 248 Conn. 572, 585, 730 A.2d 1107 (1999). " 'The trial court has wide discretion in ruling on the qualification of expert witnesses and the admissibility of their opinions. . . . The court's decision is not to be disturbed unless [its] discretion has been abused, or the error is clear and involves a misconception of the law.' " Id., 585–86. " 'Generally, expert testimony is admissible if (1) the witness has a special skill or knowledge directly applicable to a matter in issue, (2) that skill or knowledge is not common to the average person, and (3) the testimony would be helpful to the court or jury in considering the issues.' " Id., 586. This third prong is essentially a relevancy requirement.

"Relevant evidence is evidence that has a logical tendency to aid the trier [of fact] in the determination of an issue. . . . One fact is relevant to another if in the common course of events the existence of one, alone or with other facts, renders the existence of the other either more certain or more probable. . . . Evidence is not rendered inadmissible because it is not conclusive. All that is required is that the evidence tend to support a relevant fact even to a slight degree, so long as it is not prejudicial or merely cumulative." (Internal quotation marks omitted.) *State* v. *Billie*, 250 Conn. 172, 181, 738 A.2d 586 (1999).

The defendant argues that Settachatgul's testimony was not relevant to the jury's determination that the defendant was the victim's attacker. The defendant argues that, because hair analysis is not a method by which identity can be positively established, such testimony is irrelevant and therefore not admissible. We disagree and conclude that the trial court did not abuse its discretion in admitting Settachatgul's testimony.

Settachatgul testified that, although microscopic hair analysis cannot identify positively the exact individual from whom the hair originated, it is useful for the purpose of determining whether a person is one of the class of people from whom the hair in question could have originated. He testified that microscopic hair analysis alone is not sufficient positively to identify an individual. Settachatgul testified only to the narrow opinion that the hairs recovered from the victim's clothing were similar to the defendant's hair. Settachatgul testified that he could not, however, say that the hairs in question were definitely the hairs of the defendant.

We conclude that this testimony was relevant to assist the jury in determining whether the defendant was the attacker. The victim identified the defendant as her attacker in a photographic array and in open court during her testimony. The state offered microscopic hair analysis evidence to show that the defendant has pubic hairs with similar characteristics to those recovered from the victim's clothing. The trier reasonably could have found that this evidence rendered the victim's identification of the defendant as her assailant more certain or more probable and tended to support the identification. Thus, the evidence was relevant.

The defendant also argues that the testimony concerning the hair analysis should have been excluded because Settachatgul did not adhere to proper procedures in conducting the hair analysis. Specifically, the

defendant claims that Settachatgul's analysis was unreliable because he did not evaluate all of the hair characteristics discussed in the forensic literature, and because he did not take measurements of the diameter or length of the hair, or quantify the density of pigment, the degree of curliness, or the color of the hair. The state counters that such measurements are not generally required, and that Settachatgul's nondestructive, comparative procedures fully complied with the standard operating procedures of forensic laboratories in Connecticut.

Once the trial court has served its gatekeeping function in accordance with *Porter* and determined that the expert testimony will be admitted, any challenges to the methodology used in the process generally go to the weight of the testimony and not its admissibility. "Once the validity of a scientific principle has been satisfactorily established, any remaining questions regarding the manner in which that technique was *applied* in a particular case is generally an issue of fact that goes to weight, and not admissibility." (Emphasis in original.) *State* v. *Porter*, supra, 241 Conn. 88 n.31.

The defendant had the opportunity to challenge Settachatgul's methodologies on cross-examination, and, in fact, questioned him concerning his choice of which hair characteristics to analyze, and about forensic literature suggesting that certain measurements of the hair under analysis should always be made. Because the expert testimony pertaining to the hair analysis was relevant to an issue in the case, namely, the identity of the victim's attacker, and because the defendant's challenge to the methodology affected the weight of the testimony and not its reliability, we conclude that the trial court properly admitted the testimony.

II

The defendant next claims that the pretrial identification procedure was unnecessarily suggestive and unreli-

able so that admission of the identification violated his right to due process under the fifth and fourteenth amendments to the United States constitution[5] and article first, § 8, of the constitution of Connecticut.[6] We disagree.

The following additional facts are relevant to the defendant's claim. The defendant moved to suppress the victim's pretrial identification of a photograph of the defendant as that of her attacker. The trial court conducted a hearing on the motion. At the hearing, Malozzi testified that he had learned from his fellow East Hartford police officers that the defendant fit the victim's description of her attacker. Acting on this information, Malozzi chose to include a photograph of the defendant in the array that he showed to the victim. Malozzi testified that he told the victim that a photograph of a suspect was included in the array. The victim testified, however, that she was not told that there was a photograph of a suspect included in the array. The trial court did not directly resolve this inconsistency. In its ruling on the defendant's motion, however, the

[5] The fifth amendment to the United States constitution provides in relevant part: "No person shall . . . be deprived of life, liberty, or property, without due process of law . . . ."

The fourteenth amendment to the United States constitution provides in relevant part: "[N]or shall any State deprive any person of life, liberty or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws. . . ."

[6] The constitution of Connecticut, article first, § 8, provides in relevant part: "In all criminal prosecutions . . . [n]o person shall . . . be deprived of life, liberty or property without due process of law . . . ."

Because the defendant has not briefed his claim separately under the Connecticut constitution, we limit our review to the United States constitution. "We have repeatedly apprised litigants that we will not entertain a state constitutional claim unless the defendant has provided an independent analysis under the particular provisions of the state constitution at issue. . . . Without a separately briefed and analyzed state constitutional claim, we deem abandoned the defendant's claim . . . ." (Internal quotation marks omitted.) *State* v. *Eady*, 249 Conn. 431, 435 n.6, 733 A.2d 112, cert. denied, 528 U.S. 1030, 120 S. Ct. 551, 145 L. Ed. 2d 428 (1999).

trial court twice pointed to the victim's testimony that she was not under a belief that the police had put a photograph of anyone they suspected in the array. The trial court went on to state that, regardless of what the victim was told, a victim may be expected reasonably to believe that she is being asked to view the array because there is a suspect, and that a photograph of the suspect will be included in the array. Accordingly, the trial court denied the defendant's motion to suppress the identification because the procedure used to obtain it was not unduly suggestive. The trial court also found that, even if the identification procedure had been unduly suggestive, the identification nevertheless would have been admissible under the totality of the circumstances. From our review of the record, we conclude that the identification testimony properly was admitted.

"[B]ecause the issue of the reliability of an identification involves the constitutional rights of an accused . . . we are obliged to examine the record scrupulously to determine whether the facts found are adequately supported by the evidence and whether the court's ultimate inference of reliability was reasonable." (Internal quotation marks omitted.) *State* v. *Taylor*, 239 Conn. 481, 498, 687 A.2d 489 (1996), cert. denied, 521 U.S. 1121, 117 S. Ct. 2515, 138 L. Ed. 2d 1017 (1997); *State* v. *Figueroa*, 235 Conn. 145, 155, 665 A.2d 63 (1995); *State* v. *Howard*, 221 Conn. 447, 454, 604 A.2d 1294 (1992). "[T]he required inquiry is made on an ad hoc basis and is two-pronged: first, it must be determined whether the identification procedure was unnecessarily suggestive; and second, if it is found to have been so, it must be determined whether the identification was nevertheless reliable based on an examination of the totality of the circumstances." (Internal quotation marks omitted.) *State* v. *Taylor*, supra, 498, quoting *State* v. *Tatum*, 219 Conn. 721, 727, 595 A.2d 322 (1991).

To prevail on his claim, the defendant has the burden of showing that the trial court's determinations of suggestiveness and reliability both were incorrect. See *State* v. *Taylor*, supra, 498; *State* v. *Mayette*, 204 Conn. 571, 578, 529 A.2d 673 (1987). "An identification procedure is unnecessarily suggestive only if it gives rise to a very substantial likelihood of irreparable misidentification." (Internal quotation marks omitted.) *State* v. *Taylor*, supra, 499; *State* v. *White*, 229 Conn. 125, 161–62, 640 A.2d 572 (1994).

"[R]eliability is the linchpin in determining the admissibility of the identification testimony . . . ." (Internal quotation marks omitted.) *State* v. *Figueroa*, supra, 235 Conn. 157, quoting *Manson* v. *Brathwaite*, 432 U.S. 98, 114, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977). To determine whether an identification that resulted from an unnecessarily suggestive procedure is reliable, the corruptive effect of the suggestive procedure is weighed against certain factors, such as "the opportunity of the [victim] to view the criminal at the time of the crime, the [victim's] degree of attention, the accuracy of [the victim's] prior description of the criminal, the level of certainty demonstrated at the [identification] and the time between the crime and the [identification]." (Internal quotation marks omitted.) *State* v. *Figueroa*, supra, 157; see *Manson* v. *Brathwaite*, supra, 114; *State* v. *Wooten*, 227 Conn. 677, 687–88, 631 A.2d 271 (1993); *State* v. *Evans*, 200 Conn. 350, 356, 511 A.2d 1006 (1986); *State* v. *Theriault*, 182 Conn. 366, 373–74, 438 A.2d 432 (1980).

"[W]e examine the legal question of reliability with exceptionally close scrutiny and defer less than we normally do to the related fact finding of the trial court." (Internal quotation marks omitted.) *State* v. *Wooten*, supra, 227 Conn. 688. "Absent a very substantial likelihood of irreparable misidentification, [w]e are content to rely upon the good sense and judgment of American juries, for evidence with some element of untrustwor-

thiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature." (Internal quotation marks omitted.) Id., quoting *State* v. *Ramsundar*, 204 Conn. 4, 13, 526 A.2d 1311, cert. denied, 484 U.S. 955, 108 S. Ct. 348, 98 L. Ed. 2d 374 (1987); see *Manson* v. *Brathwaite*, supra, 432 U.S. 116.

It is proper for a court, in determining whether an identification procedure was unduly suggestive, to consider the fact that a police officer tells a victim that a suspect is in a photographic array. *State* v. *Austin*, 195 Conn. 496, 500, 488 A.2d 1250 (1985). Such a statement, however, is not enough to render an identification procedure unduly suggestive. See *State* v. *Williams*, 203 Conn. 159, 177, 523 A.2d 1246 (1987). It is true that this court previously has stated that an identification procedure could be invalidated when police expressly indicate to a victim that a suspect is included in a photographic array. See *State* v. *White*, 229 Conn. 125, 163, 640 A.2d 572 (1994).[7] The admissibility of identification testimony is to be determined by the totality of the circumstances, however. Even if the identification procedure is unnecessarily suggestive because of a police statement, the identification may still be admitted if the totality of the circumstances is such that the identification was nevertheless reliable. See id., 161; see also *State* v. *Findlay*, 198 Conn. 328, 338, 502 A.2d 921, cert. denied, 476 U.S. 1159, 106 S. Ct. 2279, 90 L. Ed.

---

[7] *White* cites to *State* v. *Williams*, supra, 203 Conn. 177, which, in turn, cites to *State* v. *Austin*, supra, 195 Conn. 500. *Austin* relies on two federal cases that state that "[l]aw enforcement personnel should avoid telling a witness that a definite suspect is in a lineup but it is not absolutely impermissible. Such statement has some degree of suggestiveness and, depending upon the circumstances, may be a factor to be considered in determining whether the lineup was unduly suggestive." *United States* v. *Gambrill*, 449 F.2d 1148, 1151 n.3 (D.C. Cir. 1971); *Martinez* v. *Turner*, 461 F.2d 261, 264 (10th Cir. 1972).

2d 721 (1986) (photographic identification procedure unnecessarily suggestive but admitted under totality of circumstances); *State* v. *Owens*, 38 Conn. App. 801, 811, 663 A.2d 1094, cert. denied, 235 Conn. 912, 665 A.2d 609 (1995) ("[e]ven if a court finds that the police expressly informed witnesses that the defendant would be in the array, our courts have found the identification procedure unnecessarily suggestive only when other factors exist that otherwise emphasize the defendant's photograph"); *State* v. *Mendez*, 15 Conn. App. 531, 534, 545 A.2d 587, cert. denied, 209 Conn. 810, 548 A.2d 441 (1988) (even though photographic identification procedure unnecessarily suggestive, identification admitted under totality of circumstances).

This court has stated explicitly that "little harm is likely to arise where the [victim], even without the police comment, would have inferred that the occasion for his being requested to identify someone is that the police have a particular person in mind who has been included among those to be viewed." *State* v. *Austin*, supra, 195 Conn. 500. When presented with a photographic array by the police, crime victims reasonably can surmise that the police may consider one of the persons in the array to be a suspect in the case. See *State* v. *White*, supra, 229 Conn. 163; *State* v. *Williams*, supra, 203 Conn. 177; *State* v. *Fullwood*, 193 Conn. 238, 245, 476 A.2d 550 (1984).[8] In the present case, the trial court recognized this principle.

We conclude that the trial court reasonably found that the defendant did not meet his burden of showing a

---

[8] One court, in a case cited by the trial court in its decision on the defendant's motion to suppress the identification in this case, has even stated that it is "foolish not to assume" that a victim would believe that at least someone in the array is a suspect. *Towles* v. *United States*, 428 A.2d 836, 845 (D.C. App. 1981), on appeal after remand, 496 A.2d 560 (D.C. App.), vacated, 497 A.2d 793 (D.C. App.), cert. dismissed, 474 U.S. 935, 106 S. Ct. 269, 88 L. Ed. 2d 276 (1985), on reconsideration en banc, 521 A.2d 651 (D.C. App.), cert. denied, 483 U.S. 1008, 107 S. Ct. 3236, 97 L. Ed. 2d 741 (1987).

substantial likelihood that the identification procedure was so unreliable that the victim's pretrial identification of him should not be admitted. The trial court found that the victim had ample opportunity to view her attacker both during and after the attack. The victim testified that she clearly saw the defendant's face while the defendant was on top of her, forcing her to perform fellatio on him for a period of ten minutes. The victim further testified that she had an opportunity to view her attacker's face after the attack, both as she pulled up her pants and as the attacker held her by the arm and forced her back across the field toward Burnside Avenue. Malozzi testified that, one night, when he was in the area where the attack occurred, he was able to make out the features of another officer's face from approximately ten feet away. The victim's description of her attacker, which she gave to Fox shortly after the attack, included freckles across the bridge of his nose. During the trial, the defendant approached the jury box in order to allow the jury to view his facial features and to see his freckles. The victim identified the photograph of her attacker from the photographic array just four days after the attack. See State v. Figueroa, supra, 235 Conn. 159 (nine months between crime and identification not enough to render identification unreliable); State v. Parker, 197 Conn. 595, 600, 500 A.2d 551 (1985) (ten month period between crime and identification not so long as to render identification unreliable). Malozzi testified that the victim identified the defendant immediately when presented with the array, and that she began to cry and shake upon seeing the photograph. The victim testified that her attacker's face was "[a] face I would not forget. It was imprinted on my mind." Both Malozzi and the victim testified that Malozzi made it clear that she was not to select a photograph from the array if she did not see her attacker. We therefore conclude that the trial court properly denied the defendant's motion to suppress the pretrial identification.

## III

The defendant's final claim is that the trial court, in its jury charge, improperly marshaled the evidence in an unfair and inaccurate manner, and unfairly drew attention to the state's case. We disagree.

"Our analysis begins with a well established standard of review. When reviewing [a] challenged jury instruction . . . we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper. . . . [I]n appeals involving a constitutional question, [the standard is] whether it is reasonably possible that the jury [was] misled. . . . In determining whether it was . . . reasonably possible that the jury was misled by the trial court's instructions, the charge to the jury is not to be critically dissected for the purpose of discovering possible inaccuracies of statement, but it is to be considered rather as to its probable effect upon the jury in guiding [it] to a correct verdict in the case. . . . The charge is to be read as a whole and individual instructions are not to be judged in artificial isolation from the overall charge. . . . The test to be applied . . . is whether the charge, considered as a whole, presents the case to the jury so that no injustice will result." (Citations omitted; internal quotation marks omitted.) *State* v. *Albert*, 252 Conn. 795, 815–16, 750 A.2d 1037 (2000).

We conclude, after carefully reviewing the court's instructions, that it is not reasonably possible that the jury was misled by the court's marshaling of the evidence. At least four times during its final charge to the jury, the trial court explicitly instructed the jury that its exclusive function was to find facts, that the court's discussion of the facts was not binding and that the jury should make factual determinations independent of the court's determinations. The trial court also explicitly instructed the jury that the court was not in any way placing emphasis on any of the evidence. Both of these factors have been deemed persuasive to show that it was not possible for the jury to be misled by the trial court's marshaling of the evidence. See *State* v. *Delgado*, 247 Conn. 616, 631, 725 A.2d 306 (1999). Moreover, even if there had been error in the trial court's charge, the error would have been cured by the court charging the jury "not once but several times, that the jury's recollection of the evidence controlled." *State* v. *Pollitt*, 205 Conn. 132, 156–57, 531 A.2d 125 (1987).

The defendant relies on isolated instances in the record as support for his claim, rather than viewing the charge to the jury as a whole. See *State* v. *Figueroa*, supra, 235 Conn. 170. We conclude, from a "careful and thorough review of the record"; *State* v. *Delgado*, supra, 247 Conn. 629; that the trial court properly highlighted facts and theories integral to the defendant's defense of misidentification. See id., 630.

The judgment is affirmed.

In this opinion the other justices concurred.