STATE OF CONNECTICUT *v.* ROBERT COOK
(SC 16757)

Sullivan, C. J., and Norcott, Katz, Vertefeuille and Zarella, Js.

Argued October 21, 2002—officially released March 25, 2003

*Donald D. Dakers*, special public defender, for the appellant (defendant).

*James M. Ralls*, assistant state's attorney, for the appellee (state).

*Opinion*

SULLIVAN, C. J. The defendant, Robert Cook, appeals from the judgment of conviction, rendered after a jury trial, on charges of robbery in the first degree in violation of General Statutes § 53a-134 (a),[1] conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48 (a)[2] and 53a-134 (a) and commis-

---

[1] General Statutes § 53a-134 (a) provides in relevant part: "A person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery as defined in section 53a-133 or of immediate flight therefrom, he or another participant in the crime: (1) Causes serious physical injury to any person who is not a participant in the crime; or (2) is armed with a deadly weapon; or (3) uses or threatens the use of a dangerous instrument; or (4) displays or threatens the use of what he represents by his words or conduct to be a pistol, revolver, rifle, shotgun, machine gun or other firearm, except that in any prosecution under this subdivision, it is an affirmative defense that such pistol, revolver, rifle, shotgun, machine gun or other firearm was not a weapon from which a shot could be discharged. . . ."

[2] General Statutes § 53a-48 (a) provides: "A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy."

sion of a class A, B or C felony with a firearm in violation of General Statutes § 53-202k.[3] The defendant claims that the trial court abused its discretion by: (1) permitting the victim of the robbery to testify as to the similarities she had observed between the defendant and the person who had robbed her; and (2) denying the defendant's motion for a mistrial after a state's witness testified that he was a career criminal prosecutor who prosecuted defendants charged with serious felonies who had previous convictions. We transferred the appeal from the Appellate Court to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On the night of December 11, 1998, at approximately 9 p.m., the defendant, armed with a shotgun, robbed the Xtra Mart, a twenty-four hour convenience store, located on Hartford Turnpike in Tolland. While the defendant was robbing the store, Harry Rivers, his friend, was waiting outside in a car.

At approximately 8:50 p.m., Nina Miller was the only employee working at the Xtra Mart. When the defendant entered the store, Miller had her back to the front door and did not immediately turn around. She heard the sound of a shotgun being pumped and heard the defendant say that he wanted everything right away. When she turned around, the defendant was standing at the counter pointing the shotgun at her. She observed that he was wearing a dark baseball cap, a sweatshirt, a

[3] General Statutes § 53-202k provides: "Any person who commits any class A, B or C felony and in the commission of such felony uses, or is armed with and threatens the use of, or displays, or represents by his words or conduct that he possesses any firearm, as defined in section 53a-3, except an assault weapon, as defined in section 53-202a, shall be imprisoned for a term of five years, which shall not be suspended or reduced and shall be in addition and consecutive to any term of imprisonment imposed for conviction of such felony."

dark jacket with red lining and had a purple bandana over the lower portion of his face; he was approximately five feet seven or five feet eight inches tall, with dark eyes and a medium build; and the area from the bridge of his nose to his forehead was uncovered, revealing that he was a black male with a clear complexion.

Miller attempted to open the cash register but was not immediately able to do so. The defendant told her she had ten seconds to open the register "or else." At that point, the register flew open and Miller removed the money. The defendant then demanded that Miller give him the money in the safe. She pulled two bags containing coins from the safe and put them on the counter. Miller then placed the bills from the cash register into the bags. The defendant then ordered Miller to check under the cash register drawer for bills. She pulled out the drawer and informed him that he had everything, at which point the defendant took the bags and left the store. Miller closed the cash register and pushed the store's panic button, which automatically dialed the police. Two state police troopers arrived at the store at approximately 9:10 p.m.

Between 9:45 p.m. and 10 p.m. on that night, local police arrested the defendant and Rivers in Wallingford for a robbery in New Haven. At the time of the arrest, the police seized the shotgun, the money and the money-bags from the Tolland robbery. The defendant was charged in Tolland for the robbery of the Xtra Mart and in New Haven for a separate robbery. Rivers also was charged in New Haven and in Tolland in connection with the same robberies.

In November, 1999, the defendant was tried in New Haven for the robbery that had occurred there. Miller identified the defendant for the first time at the New Haven trial and testified that she was 85 to 90 percent

certain that the defendant was the man who had robbed her in Tolland.[4]

Miller was a state's witness again at the Tolland trial. At that trial, the defense filed a motion to suppress any identification of the defendant and objected to admitting Miller's identification testimony, stating that the identification procedure used when Miller identified the defendant at his New Haven trial had been unnecessarily suggestive. Outside the presence of the jury at the Tolland trial, Miller testified that she had not identified the defendant prior to the trial in New Haven and that she had not been shown any photographs of the defendant. She further testified that, on the night of the robbery, a police officer had told her that "they had picked someone up in Wallingford and that they were going to go and I.D. him . . . . [T]hey didn't need [her to identify the man whom they arrested]," and that she had had no other contact with the police or prosecutors until she met with the prosecutor in New Haven prior to the defendant's trial there. Miller testified that the New Haven prosecutor had informed her that the state wanted to tie the New Haven case to the Tolland case, but the prosecutor did not tell her that the police had arrested the man who had robbed her. Miller further testified that, on the day before the New Haven trial, the New Haven prosecutor had shown her the videotape taken by the surveillance cameras in the Xtra Mart, several still photographs taken from that videotape and photographs of the evidence seized on the night of the Tolland robbery, namely, the moneybags, the money, the gun, and Rivers' and the defendant's clothing. On cross-examination, she testified that the New Haven prosecutor also had pointed out to her that the items in the photographs were similar to the items shown in the videotape.

---

[4] The record before this court does not reflect why, other than to identify the defendant, Miller testified at the New Haven trial.

The trial court ruled that Miller could testify as to the similarities between the defendant and the man who had robbed her. This testimony, the court stated, was not identification testimony. Rather, it concluded that the prosecutor would be "asking this witness to come in close proximity to [the defendant], similar to the proximity she was that night, and indicate whether or not any of those identifying factors that she's already testified to are consistent with what she's now looking at with [the defendant]. That's perfectly allowable. It's relevant. The probative value clearly outweighs any prejudicial value . . . ." The court further stated that "as far as suggestiveness, since the suggestiveness, if any, was at the [New Haven] trial, which is a necessary proceeding, I don't think that's an issue."

Thereafter, the jury convicted the defendant of robbery in the first degree, conspiracy to commit robbery in the first degree and commission of a class A, B or C felony with a firearm. This appeal followed.

The defendant raises two issues on appeal. First, he claims that the trial court abused its discretion in permitting Miller to testify in the Tolland trial as to the similarities between the defendant and the man who had robbed her. Specifically, the defendant contends that the pretrial identification procedure in the present case, namely, the identification procedure used at the New Haven trial, was unnecessarily suggestive. The defendant so contends because: (1) the police, on the night of the Xtra Mart robbery, told Miller that they had picked someone up in Wallingford and did not need her to identify him; and (2) the New Haven prosecutor, in preparation for Miller's testimony at the New Haven trial, showed Miller the evidence seized the night that the defendant was arrested, namely the money, the moneybags, the gun, and the clothing worn by the defendant and Rivers. The defendant's second claim is that the trial court abused its discretion in denying the defen-

dant's motion for a mistrial after Roger Dobris, a senior assistant state's attorney, testified that he was a prosecutor in the career criminal unit and that he prosecuted defendants who had been charged with serious felonies and who had on prior occasions been convicted.

## I

We first address the defendant's claim that the trial court abused its discretion in allowing Miller to testify as to the similarities she observed between the defendant and the man who had robbed her because the identification procedure used in the New Haven trial was unnecessarily suggestive and because the tainted identification at that trial tainted the subsequent identification at issue in the present case. The state contends that the trial court did not abuse its discretion because: (1) Miller did not identify the defendant but, rather, gave "resemblance testimony";[5] (2) even if this court were to conclude that Miller identified the defendant in the Tolland trial, the identification procedure at the New Haven trial was not unnecessarily suggestive;[6] and (3) even if the identification procedure at the New Haven trial was unnecessarily suggestive, the trial court

[5] The state contends that "resemblance testimony" is distinguishable from identification testimony and that the admissibility of resemblance testimony that is the result of unnecessarily suggestive pretrial identification procedures is assessed under a less rigorous standard than is identification testimony. The state asks us to overrule *State* v. *Lago*, 28 Conn. App. 9, 16–17, 611 A.2d 866, cert. denied, 223 Conn. 919, 614 A.2d 828 (1992), in which the Appellate Court concluded that, although there is a distinction between resemblance and identification testimony, the standard for admissibility when there has been unnecessarily suggestive pretrial identification procedures is the same for both. We need not reach this question, however, because we conclude that Miller's testimony was admissible under the more rigorous standard applied to identification testimony.

[6] For clarity, we refer to Miller's testimony in the Tolland trial as "identification" testimony without passing on the question of whether it was actually "resemblance" testimony and whether classification of the testimony as resemblance, rather than identification, testimony would implicate a lower standard for admissibility. See footnote 5 of this opinion.

reasonably could have concluded that Miller's testimony at the Tolland trial ultimately was reliable. We conclude that the trial court reasonably determined that the pretrial identification procedure was not unnecessarily suggestive and, further, that even if it were, Miller's testimony was reliable. Accordingly, we conclude that the trial court did not abuse its discretion in admitting Miller's identification testimony.

We begin our analysis by setting forth the relevant standard of review. "[B]ecause the issue of the reliability of an identification involves the constitutional rights of an accused . . . we are obliged to examine the record scrupulously to determine whether the facts found are adequately supported by the evidence and whether the court's ultimate inference of reliability was reasonable. . . . [T]he required inquiry is made on an ad hoc basis and is two-pronged: first, it must be determined whether the identification procedure was unnecessarily suggestive; and second, if it is found to have been so, it must be determined whether the identification was nevertheless reliable based on an examination of the totality of the circumstances. . . . To prevail on his claim, the defendant has the burden of showing that the trial court's determinations of suggestiveness and reliability both were incorrect. . . . An identification procedure is unnecessarily suggestive only if it gives rise to a very substantial likelihood of irreparable misidentification." (Citations omitted; internal quotation marks omitted.) *State* v. *Reid*, 254 Conn. 540, 554–55, 757 A.2d 482 (2000); *State* v. *White*, 229 Conn. 125, 161–62, 640 A.2d 572 (1994).

## A

In accordance with this two part methodology, we begin our inquiry by considering whether the pretrial identification procedure in the present case was unnecessarily suggestive. This court previously has recog-

nized in the context of photographic array identifications that "[i]t is proper for a court, in determining whether an identification procedure was unduly suggestive, to consider the fact that a police officer tells a victim that a suspect is in a photographic array. . . . Such a statement, however, is not enough to render an identification procedure unduly suggestive. . . . It is true that this court previously has stated that an identification procedure could be invalidated when police expressly indicate to a victim that a suspect is included in a photographic array. . . . The admissibility of identification testimony is to be determined by the totality of the circumstances, however." (Citations omitted.) *State* v. *Reid*, supra, 254 Conn. 556. Further, "[t]his court has stated explicitly that little harm is likely to arise where the [victim], even without the [allegedly suggestive] police comment, would have inferred that the occasion for his being requested to identify someone is that the police have a particular person in mind who has been included among those to be viewed." (Internal quotation marks omitted.) Id., 557.

"Generally, an in-court testimonial identification need be excluded, as violative of due process, only when it is tainted by an out-of-court identification procedure which is unnecessarily suggestive and conducive to irreparable misidentification. . . . The [United States] Supreme Court has not extended its exclusionary rule to in-court identification procedures that are suggestive because of the trial setting. . . . There is no constitutional requirement that an in-court identification confrontation be conducted as a lineup or be otherwise free of suggestion. An in-court testimonial identification must be excluded if it is the product of an out-of-court confrontation arranged by the state, which was unnecessarily suggestive and conducive to irreparable misidentification. . . . [W]ithout more, the mere exposure of the accused to a witness in the suggestive setting of

a criminal trial does not amount to the sort of impermissible confrontation with which the due process clause is concerned. . . .

"We know of no authority which would prohibit, as unduly suggestive, an exclusively in-court identification. . . . The defendant's protection against the obvious suggestiveness in any courtroom identification confrontation is his right to cross-examination. . . . The innate weakness in any in-court testimonial identification is grounds for assailing its weight rather than its admissibility. . . .

"The manner in which in-court identifications are conducted is not of constitutional magnitude but rests within the sound discretion of the trial court." (Citations omitted; internal quotation marks omitted.) *State* v. *Smith*, 200 Conn. 465, 469–70, 512 A.2d 189 (1986); see also *State* v. *Tatum*, 219 Conn. 721, 730–31, 595 A.2d 322 (1991). Moreover, "[b]ecause the defendant . . . had the . . . weapon of cross-examination to combat the suggestiveness of the setting . . . the risk of misidentification was held to a minimum." (Citation omitted.) *State* v. *Tatum*, supra, 731.

In the present case, the defendant claims that the fact that the police informed Miller on the night that she was robbed that they had arrested someone was unnecessarily suggestive. We disagree. At the most, Miller could have concluded from that comment that the defendant was the person who had been arrested on the night of the robbery. We recognize that, in other contexts, such as in photographic array identifications, such a comment may be unnecessarily suggestive. See *State* v. *Reid*, supra, 254 Conn. 556. In the context of an in-court identification, however, the potential inference from the fact that the defendant had been arrested on the night of the robbery could have caused little harm because, even without it, Miller necessarily would have

inferred that the defendant was the state's primary suspect. See id., 557. As we recognized in both *Tatum* and *Smith*, exclusively in-court identifications are *inherently* suggestive. *State* v. *Tatum*, supra, 219 Conn. 730–31; *State* v. *Smith*, supra, 200 Conn. 469–70. We cannot perceive how Miller's prior knowledge that *someone* had been arrested for the robbery could have unduly influenced her identification of the defendant in the courtroom, when his presence there was conclusive proof that *he* had been arrested. The inherent suggestiveness of the in-court identification thus rendered the police comment harmless.

The defendant also makes much of the fact that, in preparation for the New Haven trial, Miller was shown photographs of the gun, the money, the moneybags and the clothing that were seized on the night that the defendant was arrested. The defendant fails, however, to point to any authority for his assertion that showing a witness evidence in preparation for trial renders a subsequent in-court identification unnecessarily suggestive. The defendant does not dispute that this was evidence that was both admissible and relevant to prove that the defendant was the perpetrator of the crime. Moreover, Miller was the only eyewitness to the crime and, as a result, her identification of the evidence was necessary to the state's case. Nevertheless, the defendant now claims that it was unnecessarily suggestive to show Miller that evidence.

The defendant's theory, although not entirely clear from his brief, appears to be that, by showing Miller the items that it intended to introduce into evidence against the defendant, the state improperly suggested that the items had been found in the defendant's possession and, therefore, that the defendant must have been the perpetrator. The defendant fails to recognize, however, that Miller's identification of the items *enhanced* the reliability of her in-court identification of the defen-

dant. The state had no way of knowing in advance whether she would recognize the items and, if she had failed to recognize them, the defendant scarcely could claim that showing them to her was suggestive. It is true that the fact that she *did* recognize the items strengthened the state's case against the defendant. That fact alone, however, in the absence of any evidence that Miller was unduly influenced to connect the items to the defendant,[7] does not mean that the procedure was unnecessarily suggestive. The state is not required to avoid any pretrial conduct or procedure that might lead to the conclusion that a particular defendant is guilty. Accordingly, we conclude that preparing Miller for trial by reviewing the evidence that she was to be asked to identify at trial was proper and was not unnecessarily suggestive. Therefore, we do not agree with the defendant that Miller's identification of the defendant at the New Haven trial should have been excluded. The defendant has provided no authority that a *proper* prior in-court identification is unnecessarily suggestive.

B

Even if we were to assume that the identification procedure used at the defendant's New Haven trial was unnecessarily suggestive, we conclude that the trial court reasonably could have determined that Miller's testimony at the Tolland trial was ultimately reliable. "[R]eliability is the linchpin in determining the admissibility of identification testimony . . . ." *Manson* v. *Brathwaite*, 432 U.S. 98, 114, 97 S. Ct. 2243, 53 L. Ed.

---

[7] The record shows that, contrary to the defendant's suggestion, the state did not inform Miller that the items seized on the night of the robbery matched those possessed by the defendant. Rather, it merely asked her to view the items and pointed out that the items were similar to the items shown on the security videotape of the robbery. The fact that the state may have suggested that the items matched those shown to be possessed by the *perpetrator* in the videotape does not mean that it improperly suggested that the items had been in the possession of the defendant.

2d 140 (1977). "To determine whether an identification that resulted from an unnecessarily suggestive procedure is reliable, the corruptive effect of the suggestive procedure is weighed against certain factors, such as the opportunity of the [victim] to view the criminal at the time of the crime, the [victim's] degree of attention, the accuracy of [the victim's] prior description of the criminal, the level of certainty demonstrated at the [identification] and the time between the crime and the [identification]." (Internal quotation marks omitted.) *State* v. *Reid*, supra, 254 Conn. 555.

"[W]e examine the legal question of reliability with exceptionally close scrutiny and defer less than we normally do to the related fact finding of the trial court. . . . Absent a very substantial likelihood of irreparable misidentification, [w]e are content to rely upon the good sense and judgment of American juries, for evidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature." (Citation omitted; internal quotation marks omitted.) Id., 555–56.

In the present case, Miller had ample opportunity to view the defendant in a well lighted store. Further, Miller was paying a high degree of attention to the defendant during the commission of the crime. She testified that she was looking at the defendant during the time he was in the store, except when she opened the cash register and opened the safe. Moreover, "[a] victim of a crime is apt to be a more reliable source of identification than is a mere spectator to the incident." (Internal quotation marks omitted.) *State* v. *Payne*, 219 Conn. 93, 109, 591 A.2d 1246 (1991). Miller's description to the police of the perpetrator was consistent with the defendant's appearance. Although his face was largely covered by a bandana, Miller was able to give a state-

ment to the police in which she described the perpetrator's height, weight, build, skin color, the clearness of his skin, the gun he was carrying and clothing. Miller testified at the New Haven trial, her first identification of the defendant, that she was 85 to 90 percent certain that the defendant was the man who had robbed her. Miller's first identification of the defendant took place eleven months after the robbery occurred. She was, however, able to view the videotape from the store filmed on the night of the robbery prior to attempting to identify the defendant, thereby refreshing her memory as to what she saw that night. Moreover, Miller was subject to cross-examination by the defendant. See *State* v. *Tatum*, supra, 219 Conn. 731. Finally, as we have noted, her independent identification of the items seized from the defendant's possession enhanced the reliability of Miller's in-court identification. Taking all of these factors into account, we conclude that Miller's identification testimony was reliable.

Because the identification procedure at the defendant's New Haven trial was not unnecessarily suggestive and, further, even if it was, because Miller's testimony at the defendant's Tolland trial was otherwise reliable, we conclude that the trial court did not abuse its discretion in admitting Miller's identification testimony.

II

The defendant next contends that the trial court abused its discretion in denying the defendant's motion for a mistrial after a state's witness testified that he was a career criminal prosecutor in New Haven who prosecuted defendants charged with serious felonies who have on prior occasions been convicted. The defendant maintains that this testimony was so prejudicial as to warrant a mistrial because the jury could infer from the testimony that the defendant was a "career

criminal" who had been prosecuted by the witness in the past. The state responds that the trial court did not abuse its discretion in denying the defendant's motion for a mistrial because it struck the witness' testimony and issued a curative instruction. We agree with the state.

The following additional facts and procedural history are relevant to this claim. Rivers testified as a state's witness in the defendant's Tolland trial, in exchange for the state's promise to transfer his Tolland case to New Haven and to consolidate the two cases. Rivers testified that, while he was incarcerated on the charges relating to the robberies, the defendant had slipped two notes to him. Rivers received the first note directly from the defendant, who had handed it to Rivers while they both were incarcerated awaiting trial. In this note, the defendant instructed Rivers to testify that he had lied to the police when he told them that the defendant had robbed the store. Rivers received the second note from the defendant two days later through a cook at the jail. In the second note, the defendant reiterated his earlier instructions to Rivers about how he should testify. The defendant, however, added what Rivers believed to be a threat that, if Rivers did not testify as the defendant wanted, there were people who "want to handle you [Rivers] for me . . . ." The second note also referred to an offer made by the New Haven prosecutor for a deal the defendant would receive if he pleaded guilty. This latter portion of the letter was redacted before the state offered the letter into evidence and Rivers had no basis of knowledge of the deal other than from reading the second note.

Neither of the notes was signed by the defendant and, on cross-examination of Rivers, defense counsel called into question whether the notes actually were written by the defendant. On rebuttal, the state called as a witness Dobris, who testified as follows:

"[State's Attorney]: Sir, are you an attorney?

"[Dobris]: Yes, I am.

"[State's Attorney]: And are you licensed to practice in the state of Connecticut?

"[Dobris]: Yes, I am. . . .

"[State's Attorney]: Okay. And what's your current position, sir?

"[Dobris]: I'm a senior assistant state's attorney in the judicial district of New Haven, and I work in the career criminal unit.

"[State's Attorney]: Okay. And how long, sir, have you been an assistant state's attorney?

"[Dobris]: Since June of 1988.

"[State's Attorney]: Okay. Can you tell us, sir—tell the jury what your duties are in that position?

"[Dobris]: Yes, ma'am. I'm a prosecuting attorney. I work in the judicial district of New Haven. As I said, I work in the career criminal unit. I'm a trial prosecutor where in the career criminal unit we take defendants who have been arrested, charged with serious felonies, who have—

"[Defense Counsel]: Your Honor, I'm gonna—

"[Dobris]:—on prior occasions been convicted. . . .

"The Court: One moment, Mr. Dobris. . . .

"[Defense Counsel]: I asked the jury to be excused, Your Honor."

Outside the presence of the jury, the defense counsel reiterated his objection stating that the jury had been tainted by Dobris' testimony. The state's attorney indicated that Dobris had been called to testify because he was familiar with the plea bargain offered to the

defendant in New Haven. The state's attorney then stated: "I will then show him the two letters which Mr. Rivers received and ask him to direct his attention to certain portions of that letter . . . and without having him enumerate the number of years that are listed there, did those numbers look familiar to him and why they look familiar to him, but not have him mention anything about the actual numbers. . . . And the reason that that is relevant is that [defense counsel] attempted to plant in the jury's mind when Mr. Rivers testified any— he even asked Mr. Rivers this: Isn't it, in fact, true that you knew all this information, and that you really wrote these letters, not [the defendant]? This testimony will tend to show that this was a plea bargain specifically for [the defendant] that only [the defendant] would know, and that's why these letters are—were not written by—tend to show that's why these letters were not written by Harry Rivers. So it's to rehabilitate Rivers' credibility."

The trial court ruled that the prejudicial effect of Dobris' testimony outweighed its probative value and that any further testimony of Dobris was inadmissible. The court, however, denied the defendant's motion for a mistrial and instead gave the following curative instruction.

"The last witness, Mr. Dobris, who was about to testify—in your absence I tried to determine what line of questioning he would be asked about and whether or not it would be relevant to this case; and I have ruled that his proposed testimony would not be relevant to this case.

"So any of you who are taking notes, you draw a line through it. Rip out the page. Shred it. Do whatever you want to do. It has absolutely nothing to do with the case. He is not an issue in the case. He is not a witness

in the case. He is a figment of your imagination if you thought he was here.

"Like I told you the first day of jury selection, if you ask to be excused before the lists are printed, you're not here. You're a figment of my imagination. The jury computer doesn't treat you as being in attendance.

"Same with Mr. Dobris for these proceedings. He wasn't here. Nothing that he said or would have said, which I determined in your absence, would be relevant to this case, so totally disregard it. Thank you."

"The principles that govern our review of a trial court's ruling on a motion for a mistrial are well established. Appellate review of a trial court's decision granting or denying a motion for a [mistrial] must take into account the trial judge's superior opportunity to assess the proceedings over which he or she has personally presided. *State* v. *Hammond*, [221 Conn. 264, 269, 604 A.2d 793 (1992)]. Thus, [a] motion for a [mistrial] is addressed to the sound discretion of the trial court and is not to be granted except on substantial grounds. . . . In our review of the denial of a motion for mistrial, we have recognized the broad discretion that is vested in the trial court to decide whether an occurrence at trial has so prejudiced a party that he or she can no longer receive a fair trial. The decision of the trial court is therefore reversible on appeal only if there has been an abuse of discretion. . . . *State* v. *Newsome*, 238 Conn. 588, 628–29, 682 A.2d 972 (1996). . . . *State* v. *McIntyre*, [250 Conn. 526, 533, 737 A.2d 392 (1999)]. Therefore, we must determine whether [Dobris'] stricken . . . testimony was so prejudicial that it deprived the defendant of a fair trial. Furthermore, even if we were to assume that [Dobris'] testimony . . . fairly could be seen as prejudicial, we must also decide whether the trial court's curative instructions remedied any prejudice that might have occurred." (Internal quo-

tation marks omitted.) *State* v. *Whipper*, 258 Conn. 229, 257–58, 780 A.2d 53 (2001).

We conclude that Dobris' testimony was not so prejudicial as to deprive the defendant of a fair trial. The defendant contends that "[b]y calling this witness to the stand the prosecutor raised the inference that the defendant had been prosecuted in New Haven and that he had a prior criminal record since he was prosecuted by a 'career criminal' prosecutor." The defendant further contends that "[t]he jury, no doubt, was left with the impression that the defendant was a 'career criminal.' "[8] The state contends, however, that Dobris' testimony was background information and there was nothing before the jury to indicate that this testimony applied to the defendant. Moreover, the state maintains that, if the jury were to speculate, it likely would infer that Dobris was called to testify about Rivers, not the defendant. We conclude that the testimony by Dobris was not so prejudicial as to amount to a denial of the defendant's right to a fair trial.

The testimony elicited from Dobris was background information about the general duties of his job as a prosecutor. At no time did the witness indicate that he had prosecuted the defendant as a "career criminal." Additionally, as the trial court noted, as far as the jury was aware, the witness may have been brought in to bolster testimony regarding what plea agreements, if any, had been offered to Rivers. Indeed, when the witness was called, the trial court assumed that he was called to give such testimony. The court stated, "[i]n fact, when I first heard [Dobris] called, I assumed that's

---

[8] We note that the cases relied upon by the defendant in support of this claim involve prosecutorial misconduct and are inapplicable to the issue raised in the present case. The fact that, in the present case, the witness was a prosecutor does not make his testimony prosecutorial misconduct. Nor has the defendant claimed before this court that the prosecutor in the Tolland trial engaged in misconduct.

what we were getting into, to confirm that there were no, quote, deals made with Mr. Rivers. So [the jury] may well presume that that's what it had to do with, so I don't think that there would be . . . prejudice." Accordingly, we conclude that the testimony was not so prejudicial that the defendant was denied the right to a fair trial.

Moreover, as the defendant concedes, "[t]he trial court, recognizing the prejudicial nature of even calling this witness, instructed the jury not only to disregard his testimony but to treat the witness as a 'figment of your imagination.' " As we previously have stated, "[i]n the absence of an indication to the contrary, the jury is presumed to have followed [the trial court's] curative instructions. . . . [T]he burden is on the defendant to establish that, in the context of the proceedings as a whole, the stricken testimony was so prejudicial, notwithstanding the court's curative instructions, that the jury reasonably cannot be presumed to have disregarded it." (Citations omitted; internal quotation marks omitted.) *State* v. *Whipper*, supra, 258 Conn. 258. The defendant in the present case has not met this burden. We conclude, therefore, that the trial court did not abuse its discretion in denying the defendant's motion for a mistrial.

The judgment is affirmed.

In this opinion the other justices concurred.