STATE OF CONNECTICUT *v.* GABRIEL P.
HEINEMANN
(SC 17789)

Borden, Norcott, Katz, Vertefeuille and Zarella, Js.

Argued February 15—officially released May 8, 2007

*Alice Osedach,* assistant public defender, for the appellant (defendant).

*John P. Gravalec-Pannone,* senior assistant state's attorney, with whom, on the brief, were *Kevin T. Kane,*

chief state's attorney, and *Lawrence J. Tytla*, acting state's attorney, for the appellee (state).

*Marsha L. Levick* filed a brief for the Juvenile Law Center et al. as amici curiae.

*Opinion*

KATZ, J. The principal issue in this appeal is whether the trial court improperly failed to instruct the jury to consider the age of the defendant, Gabriel P. Heinemann, specifically, the level of maturity, sense of responsibility, vulnerability and personality traits of a sixteen year old, when deciding his defense of duress. According to the defendant, because it is more difficult for adolescents to resist pressures due to their limited decision-making capacity and their susceptibility to outside influences, the trial court improperly failed to provide an instruction that would have allowed the jury to factor his age into the defense, independent and regardless of how it related to the age of his coercers, with an eye toward accounting for the differences in how adolescents evaluate risks. The defendant also claims that the trial court improperly instructed the jury regarding accessorial liability as it pertains to the element of intent. We conclude that the trial court's instructions were proper. Accordingly, we affirm the judgment.

The defendant was charged in a ten count substitute information with conspiracy to commit robbery in the second degree in violation of General Statutes §§ 53a-48 (a)[1] and 53a-135 (a) (2);[2] accessory to robbery in the

---

[1] General Statutes § 53a-48 (a) provides: "A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy."

[2] General Statutes § 53a-135 (a) provides: "A person is guilty of robbery in the second degree when he commits robbery as defined in section 53a-133 and (1) he is aided by another person actually present; or (2) in the course of the commission of the crime or of immediate flight therefrom he

second degree in violation of General Statutes §§ 53a-8[3] and 53a-135 (a) (2); robbery in the second degree in violation of § 53a-135 (a) (2); conspiracy to commit burglary in the first degree in violation General Statutes §§ 53a-48 (a) and 53a-101 (a) (2);[4] accessory to burglary in the first degree in violation of §§ 53a-8 and 53a-101 (a) (2); burglary in the first degree in violation § 53a-101 (a) (2); conspiracy to commit larceny in the second degree in violation of General Statutes §§ 53a-48 (a) and 53a-123 (a) (3);[5] accessory to larceny in the second degree in violation of §§ 53a-8 and 53a-123 (a) (3); stealing a firearm in violation of General Statutes § 53a-212 (a);[6] and accessory to stealing a firearm in violation of §§ 53a-8 and 53a-212 (a). Following a trial to the jury, he was convicted of all counts, and upon agreement

or another participant in the crime displays or threatens the use of what he represents by his words or conduct to be a deadly weapon or a dangerous instrument."

[3] General Statutes § 53a-8 (a) provides: "A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender."

[4] General Statutes § 53a-101 provides in relevant part: "(a) A person is guilty of burglary in the first degree when he enters or remains unlawfully in a building with intent to commit a crime therein and . . . (2) in the course of committing the offense, he intentionally, knowingly or recklessly inflicts or attempts to inflict bodily injury on anyone.

"(b) An act shall be deemed 'in the course of committing' the offense if it occurs in an attempt to commit the offense or flight after the attempt or commission. . . ."

[5] General Statutes § 53a-123 (a) provides in relevant part: "A person is guilty of larceny in the second degree when he commits larceny, as defined in section 53a-119, and . . . (3) the property, regardless of its nature or value, is taken from the person of another . . . ."

We note that minor punctuation changes were made to § 53a-123 (a) by No. 00-103, § 2, of the 2000 Public Acts. For purposes of convenience, we refer herein to the current revision of the statute.

[6] General Statutes § 53a-212 (a) provides: "A person is guilty of stealing a firearm when, with intent to deprive another of his firearm or to appropriate the same to himself or a third party, he wrongfully takes, obtains or withholds a firearm, as defined in subdivision (19) of section 53a-3."

at sentencing, the court merged the three conspiracy counts into one count and merged the accessory counts with the underlying substantive counts. Accordingly, the court sentenced the defendant on one count each for first degree burglary, second degree robbery, first degree conspiracy, second degree larceny and theft of a firearm to a total effective sentence of twelve years imprisonment, execution suspended after eight years, followed by five years probation. This appeal followed.[7]

The jury reasonably could have found the following facts. In late 2002, the defendant was sixteen years old and living with his father in Huntersville, North Carolina. His parents were divorced, and his mother and other family members lived in Mystic, Connecticut. During October, 2002, the defendant took a class in Connecticut that was required for him to obtain a driver's license in the state. In that class, he met Taylor Celico, whom he began to date. After the defendant returned to North Carolina, he kept in contact with Celico through e-mails, and when he returned to visit his mother in November, 2002, he met with Celico.

In December, 2002, he returned again to Mystic to visit his mother and other family members. On December 19, 2002, the defendant drove his mother's van to Celico's home with the intention of taking her to the movies. While the defendant and Celico were having coffee before the movie, Celico telephoned her friend Ashley Toth, whom the defendant had not met previously, and then requested that the defendant drive to Toth's home before the movie.

Toth lived in the town of Pawcatuck with her parents. At the Toth residence, the defendant, Celico and Toth were chatting when Toth's boyfriend, Rayquan Stokely,

---

[7] The defendant appealed from the judgment of conviction of the trial court to the Appellate Court, and we then transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

and Christopher Thorne arrived. The only person that the defendant knew prior to this meeting was Celico. The defendant is white; Stokely and Thorne are black.

Shortly thereafter, the defendant, Stokely and Thorne met privately after Toth and Celico left the room and one of the males suggested that they get some marijuana. The three males, Celico and Toth then got into the defendant's van, and Toth and Celico directed the defendant to Erica DiBenedetto's home in Westerly, Rhode Island, where they believed they could obtain some marijuana. When they arrived, Toth and Celico waited in the van while the three males went to the second floor of the duplex where DiBenedetto lived. They rang her doorbell, and she let them in. DiBenedetto told them to have a seat. Her boyfriend was seated in the kitchen. Stokely and Thorne asked DiBenedetto if she had marijuana; she said that she did and went to retrieve it. As the defendant went to sit down, Stokely pulled out a gun and yelled "get on the floor." DiBenedetto and her boyfriend fell to the ground and lay facedown, while Stokely held a gun to their heads. Although she was lying facedown, DiBenedetto saw one of the black males and the defendant rummage through her home while the other black male held the gun to her and her boyfriend. At some point, DiBenedetto got up from the floor and handed them some marijuana and $200. Stokely and Thorne forced her to get back on the floor, facedown, and one of them kicked her. They bound her hands and her feet. DiBenedetto observed the defendant take presents from underneath her Christmas tree and place them in a sheet.

The defendant, Stokely and Thorne ran to the van shortly thereafter, holding a sheet containing Christmas presents. They got into the van, and the defendant drove them back to Toth's house. Everyone then went into the house, where Stephanie Bell had joined them. They went outside to smoke the marijuana taken from

DiBenedetto. Stokely stated that he wanted to do another robbery and obtain some cocaine. He then instructed Toth to find out where Bobby Blanco, the boyfriend of one of Toth's school friends, lived.

The events that followed are the subject of this case. The six persons at Toth's house, now including Bell, got into the defendant's van. Toth gave the defendant directions to a wooded residential area in North Stonington, about twenty minutes away, to where she thought Blanco lived. When they reached a Mobil gas station at an intersection, Toth told the defendant to take a left turn. A short distance down that road, the defendant was told to stop the van in front of a house located at 168 Mystic Road. Stokely and Thorne got out of the van, saying they would return in ten to fifteen minutes, and the defendant remained inside the van with the three females.

The house at 168 Mystic Road in North Stonington belonged to Arnold Perkins and Janet Perkins, who lived there with their eighteen year old daughter. A door to the house had been left unlocked for the Perkins' daughter, who was out for the evening. It was approximately 9:15 p.m. when, as the couple was watching television, Janet Perkins heard a noise from the downstairs and thought it was her daughter returning home. She went to the top of the stairs, yelled down and, getting no answer, rejoined her husband. Approximately ten minutes later, a black male, either Stokely or Thorne, whom they never had seen before, came into the upstairs room with a shotgun and told the Perkins to get onto the floor. Arnold Perkins grabbed an end table and went toward the male. At that point, another black male entered the room, put a gun to Arnold Perkins' back and told him to get on the floor. Perkins dropped to the floor, and a blanket or jacket was put over his head. His hands were bound behind his back and his feet were bound together using tele-

phone cord wires that had been pulled out from the wall. Stokely and Thorne kept asking Arnold Perkins where his son was; each time Perkins told them that he had no sons, only daughters. They asked him where the money was, and the couple feared that the men would hurt them. Arnold Perkins told them he did not have money in the house, but would take them to an automatic teller machine. One of the two intruders pulled Janet Perkins' rings off her fingers and then tied her up.

In the meantime, after waiting a few minutes outside the house for Stokely and Thorne, the defendant decided to drive the van back to the Mobil station to get gas. After returning to 168 Mystic Road, the defendant got out of the van and said he was going to check on how things were going. Five minutes later, the defendant came running back to the van, excited, and said that they had gone to the wrong house. The defendant then drove the van into the driveway of the home and turned it around so the passenger doors of the van were facing the house. The defendant got out of the van and made several trips from the home, putting items into the van.

At some point while these events were unfolding, Arnold Perkins heard a third male's voice, higher pitched than the voices belonging to the first two male intruders. Perkins could hear them taking items out of the house. One of the males asked Perkins if he had any guns in the house; he told them he did and that the guns were in the closet. While looking in the closet, the males found a safe and brought it out into the living room where the couple was tied up. The men untied Arnold Perkins, put the gun to the back of his head and demanded that he open the safe. After he complied, the two intruders tied him back up. He could hear them continuing to remove items from the home. All he was able to see of the third person standing near him was

that he had on sneakers. The intruders were in the Perkins' home for approximately forty-five minutes. After it was quiet for several minutes, Arnold Perkins was able to untie himself and his wife, and then he retrieved his cellular telephone from his car to call 911.

The three males left the house for the final time carrying out a sheet filled with items. The defendant drove everyone in the van back to Toth's house. Stokely and Thorne then left in their own car after making arrangements with the defendant about the disposal of the guns taken from the Perkins' home. The defendant then dropped Bell and Celico off at their respective homes and was directed by Toth to a location in Groton to drop off the guns.

Thereafter, the state police developed leads on several suspects in the Perkins' home invasion and learned of the identities of the various participants. From statements provided by Celico, Toth and Bell, the police located and interviewed the defendant, who gave them a twelve page written statement outlining his participation in the events of the night in question.[8]

Before addressing the defendant's specific claims of error, it is helpful to set out the following evidence that was supportive, if the jury had credited it, of his defense of duress.[9] Specifically, the defendant highlights the following evidence presented through his testimony and that of Celico, Toth and Bell. Stokely was nineteen years old, stood over six feet tall and weighed approximately 200 pounds. He was a member of a gang called "The

---

[8] The defendant was arrested for his acts in connection with the DiBenedetto home invasion, and that case was disposed of in Rhode Island. The facts of that case only are at issue in the present appeal to the extent that they relate to the defendant's defense that he had been acting under duress when he participated in the Perkins' home invasion.

[9] In light of the issues raised by the defendant in this appeal, we need not recount the evidence presented by the state to discredit the defendant's defense of duress.

Bloods," owned several different firearms and had an intimidating demeanor. Toth had described him as "controlling" and "emotionally, physically [and] sexually abusive" toward her. Thorne was a few inches shorter than Stokely, and the defendant looked like a "kid" compared to both Thorne and Stokely. The defendant testified that, early in the evening at Toth's house, he had noticed that Stokely had a gun and wore a bulletproof vest. The defendant had hidden his cellular telephone and money because he was afraid that Stokely or Thorne might try to rob him. When they first left Toth's home, the defendant believed that they were going out merely to purchase marijuana. Once at DiBenedetto's home, the defendant was surprised and frightened at what had transpired. When Stokely started shouting orders to get on the floor, the defendant thought that the orders were directed both to him as well as to DiBenedetto and her boyfriend. Stokely had ordered the defendant at gunpoint to take the presents from under DiBenedetto's Christmas tree and put them in the van, and the defendant complied because he did not believe that he had any other option. When the group of six later went out to find Blanco's house, the defendant was afraid and did not want to go, but was too intimidated to resist because of the way he had seen Stokely and Thorne behave earlier.

The defendant testified that he had not discussed with Stokely or Thorne what they were planning to do at the home, and he had no idea that they intended to commit any crimes. Bell, Toth and Celico testified that they had thought that Stokely and Thorne were getting cocaine from Blanco, and that no one had discussed a robbery. After waiting outside the house for approximately fifteen minutes, the defendant and the three females discussed leaving Stokely and Thorne there, but Toth had cautioned the defendant that if they left them stranded, there would be serious repercussions.

Specifically, Toth voiced concerns that Stokely and Thorne would hurt them or their families. This warning frightened the defendant, so he decided to wait for Stokely and Thorne, biding his time by getting gas at the Mobil station.

When he returned from the gas station, the defendant saw Thorne standing in the open doorway of the home at 168 Mystic Road. Thorne waved for the defendant to go into the house. The defendant complied and did not suspect anything unusual until he heard what sounded like people crying. The defendant saw two people lying on the floor in the living room, bound by what appeared to be a telephone cord. The defendant was "scared" for his life. Stokely and Thorne demanded that the defendant take a sheet filled with Christmas presents to the van and bring the van closer down the driveway. Thorne, with a gun in his hand, watched the defendant as he returned to the van. The defendant was too frightened to leave or to call for help. Stokely and Thorne waved the defendant back into the house, and he returned because he was afraid of what they would do if he did not comply. Stokely and Thorne had pushed a safe into the living room and were trying to open it. They ordered the defendant to open the safe, but he could not because they had pointed a gun to the back of his head and his hands were shaking. The defendant testified that he was very scared and that Stokely and Thorne appeared angry. Finally, after the defendant could not open the safe, Stokely and Thorne untied Arnold Perkins and ordered him to open the safe while holding a gun to him. Stokely and Thorne took a gun that was stored in the safe, and the trio then left the home, fleeing in the van.

As the defendant drove the group back to Toth's home, he avoided making eye contact with Stokely and Thorne because he was afraid that they would sense his fear and shoot him out of concern that he would

turn them in to the police. At Toth's home, Stokely and Thorne got out of the van and told the others, "you call the cops and you're dead." Stokely threatened to kill everyone, even if it was ten years later. They ordered the defendant to bring the items in the van to an address in Groton, where they would meet him later. Toth and the defendant thereafter met Stokely and Thorne at the designated spot, and the defendant remained in the van while they unloaded the items. Stokely then forced Toth to have sex with him, and thereafter ordered the defendant to drive her home. Toth testified that she did not go into her home and tell her parents what just had occurred because she did not believe that her parents could help them and she was fearful of Stokely coming back to get her. The defendant similarly was afraid that, if he had told his family or the police, Stokely and Thorne would retaliate by harming him and his family. On December 24, 2002, the defendant's mother telephoned him in North Carolina at his father's home to advise him that the police wanted to speak with him. He immediately returned to Connecticut and gave a lengthy written statement to the police.

On the basis of the aforementioned evidence, the trial court found that the defendant sufficiently had raised the defense of duress and charged the jury accordingly.[10] During the course of its deliberations, the jury

[10] Specifically, the court instructed the jury: "In any prosecution for an offense, it shall be a defense that the defendant engaged in the prescribed conduct because he was coerced by the use or threatened—I'm sorry—he was coerced by the use or threatened imminent use of physical force upon him or a third person, which force or threatened force of a person of reasonable firmness in his situation would have been unable to resist.

"The defense of duress shall not be available to a person who has intentionally or recklessly placed [himself] in a situation in which it is probable that he will be subjected to duress.

"And I have read to you already what intent is and what recklessness is. So, recklessness is viewed by an objective standard of whether a reasonable person's conduct deviates—whether the person's conduct is deviated from a reasonable person. That was the recklessness one.

"And there is another objective standard in this, which is that he was coerced or threatened by the use of or threatened imminent use of physical

made five inquiries concerning the court's instructions on the defense. On the first day of deliberations, the jury requested that the court restate the definition of duress and to explain "how that definition applie[d] to the element of each charge." In response, the court provided additional instructions.[11]

force upon him or a third person which force or threat [of] force a person of . . . reasonable firmness in his situation would have been unable to resist.

"Under the defense of duress, a defendant may be excused from legal responsibility for the crime charged on the ground that he was under duress at the time of the criminal activity. You are to apply an objective standard in determining whether the defendant was under duress.

"That means that the force or threatened force must be such that a person of reasonable firmness in the defendant's situation would have been unable to resist. To be under duress, the defendant must have engaged in the criminal activity because the defendant was coerced by the use or threatened imminent use of physical force upon him or a third person.

"If there was a reasonable, legal alternative to violating the law, a chance both to refuse to do the criminal act and also to avoid the threatened harm, you must find that the defendant was not under duress.

"Since the defendant has raised the defense of duress, the state has the burden of disproving the defense beyond a reasonable doubt. In other words, you cannot find that the defendant is guilty unless upon all the evidence you are satisfied beyond a reasonable doubt that the defendant was not under duress at the time the criminal activity occurred."

[11] The court provided the following supplemental instruction: "Duress is defined in the Penal Code as follows: In any prosecution for an offense, it shall be a defense that the defendant engaged in the prescribed conduct because he was coerced by the use or threatened imminent use of physical force upon him or a third person, which force or threatened force a person of reasonable firmness in his situation would have been unable to resist.

"The defense of duress shall not be available to a person who intentionally or recklessly places himself in a situation in which it is probable that he will be subjected to duress.

"Under the defense of duress, a defendant may be excused from legal responsibility for the crime charged on the ground that he was under duress at the time of the criminal activity.

"You are to apply an objective standard in determining whether the defendant was under duress. That means that the force or threatened force must be such that a person of reasonable firmness in the defendant's situation would have been unable to resist it.

"To be under duress, the defendant must have engaged in the criminal activity because the defendant was coerced by the use or threatened imminent use of physical force upon him or a third person. If there was a reasonable, legal alternative to violating the law, a chance both to refuse

On the following day, the jury requested that the court restate the elements of duress and additionally inquired "how may the age of the defendant be considered when establishing an objective standard for what a reasonable person would have done under the circumstances? Outside the presence of the jury, the court stated on the record that it was not sure how the defendant's age—sixteen—fit into the objective standard. The court gave trial counsel time to research the issue

to do the criminal act and also to avoid the threatened harm, you must find that the defendant was not under duress.

"Since the defendant has raised the defense of duress, the state has the burden of disproving the defense beyond a reasonable doubt. In other words, you cannot find the defendant guilty unless upon all evidence you are satisfied beyond a reasonable doubt that the defendant was not under duress that the criminal activity occurred.

"Let me just—I just want to give you the definition of intent and recklessness because they're part of that, and then I'll get to the second part of your question.

"Intent relates to the condition of mind of the person who commits the act, his purpose in doing it. As defined by our statutes, a person acts intentionally with respect to a result or conduct when his conscious objective is to cause such result or engage in such conduct. It's usually determined by inference.

"Recklessness. A person acts recklessly with respect to a result or a circumstance described by statute defining the offense when the defendant is aware of and consciously disregards a substantial and unjustifiable risk that such result will occur.

"So, recklessness is to disregard a substantial and unjustifiable risk in terms of duress or it's a gross deviation from the standard of conduct that a reasonable person would observe in this situation.

"So duress is not available if somebody has acted in such a way that the way they have acted is a gross deviation from the way a reasonable person would have acted in that situation, something a reasonably prudent person would or would not have done in the circumstances.

"Now, in terms of how it relates to the elements of each offense, the defense of duress has been raised to each and every one of the counts. Because duress excuses conduct and must be proved beyond a reasonable doubt not to have occurred by the state, I would suggest that what you have to do first is determine whether or not the conduct has, in fact, been proven beyond a reasonable doubt first. And then to determine whether or not the absence of duress has been proven beyond a reasonable doubt. . . . So you don't get to the duress unless you already find the conduct has occurred in terms of the statute."

and told the jury that it could not answer the jury's question at that time. The court then restated its earlier instruction on duress, and the jury retired to deliberate. After some consideration, the court called the jury back to provide additional guidance.[12]

As the jury continued to deliberate, the court and counsel continued to discuss the role of the defendant's age. The following day, the defendant asked the court to instruct the jury that, "in answering these questions, you should consider the defendant's age, health, size and mental and physical condition both of the defendant and the person alleged to have coerced him." The state told the court that it had no objection to the court's "indicating on the issue of age," but asked the court to instruct the jury on age as one of a number of factors and not to highlight it.

The court acknowledged to counsel the recent legal debate concerning what standards to apply to young adolescents but concluded that, despite available literature about the developing adolescent mind, the issue would be resolved by our well settled law on duress, under which the court noted: "[T]here are two components. One is physical strength and the other is reasonable, moral firmness. Age is a tangible, objective factor that goes to strength when viewed in terms of the reality of a threat in a physical sense from another. It does not go to the moral temperament, which is a community objective standard." The court then called the jury back for further instruction.[13]

---

[12] The court instructed the jury as follows: "We're worried about the reasonable firmness part for the same reason about whether or not a reasonable firmness in his situation also factors in age. So the only thing that you could continue to deliberate about in terms of that question is whether or not there was—whether or not he was coerced by use or threatened imminent use of physical force."

[13] The court instructed the jury: "As you know, the standard is that, an objective standard meaning that the force or threatened force must be such that a person of reasonable firmness in the defendant's situation would have been unable to resist. Okay.

The jury then continued to deliberate until, still in need of guidance, it asked the court "[t]o clarify duress, when the defendant was removed from danger, does the continued imminent danger to the Perkins' extend the defense of duress for the defendant if he has concern

"And the standard that is established is not wholly external in that the defense allows consideration of the defendant's 'situation' and the jury may take into account, and this is a quote, account of stark, tangible factors which differentiate the actor from another, okay, that is, differentiate the defendant from those threatening him, okay.

"These are tangible factors, such as size, strength, age or health. And what that goes to is the jury—the defense assumes a person of ordinary strength, okay, and will act with reasonable firmness. So tangible factors like size, strength, age or health go to ordinary strength, okay. But you may not take into account matters of temperament, okay.

"So, what this is, is the objective standard is designed to have a person's actions viewed, okay, both in terms of ordinary strength, okay. That's where obviously the differences, you know, between a 150 pound person and a 400 pound person in terms of assessing the situation; that is, the reality of the threat.

"But the jury has to hold an objective standard in terms of whether or not a person has acted with reasonable firmness, and what that means is that the drafters of the Penal Code have made a determination that it's a community standard, and there's a community sense of moral—reasonable, moral firmness. It's supposed to be nonheroic, but reasonably firm. Okay. And that's also objective in terms, of evaluating opportunities to take the legal alternatives that the defense talks about as well. . . .

"The rule does not focus on the weaknesses and strengths of a particular defendant for his subjective reaction to unlawful demand. It is—the standard imposes one which normal members of the community would be able to comply with.

"The component of duress excuses only those actors who demonstrate the level of fortitude that society can fairly expect of its morally responsible members.

"The rationale of duress requires that an accused be judged against an objective standard regardless of his own capacities or constitutional weaknesses; that is, whether the merits of a completely—so that it depends on some external standard. Okay.

"So, you can take into account age as one of the tangible factors that go to assessing the situation; that is, the comparative situation between the two actors or the three actors, the defendant on the one hand and those threatening on the other.

"So, in assessing the situation, you can take those size, weight, age into account. And then in terms of assessing reasonable assessment, that's an objective standard. Okay?"

for their safety?" The court responded "[y]es . . . [i]f there's continued imminent threat to the third parties that you find is coercive against the defendant, yes." After the court answered the jury's question, both counsel stated that they agreed with those instructions. The jury resumed its deliberations, but shortly thereafter requested the court to "restate the conditions that nullify the defense of duress." The court responded further.[14] With this background in mind, we turn to the defendant's claims.

I

Despite the lengthy jury instructions on the defense of duress, the defendant claims that the trial court

[14] The court stated: "The defense of duress shall not be available to a person who intentionally or recklessly places himself in a situation in which it is probable that he will be subjected to duress.

"The definition of intent or intentional means intent relates to the condition of mind of the person who committed the act and his purpose in doing it. As defined by our statute, a person acts intentionally with respect to conduct when his conscious objective is to cause such result or to engage in the conduct.

"What a person's intention is, is largely a matter of inference. No witness can be expected to come here and testify that he looked into another person's mind and saw a certain intention. A jury can determine what a person's intention was at any given time by determining that person's conduct—what that person's conduct was and what the circumstances were surrounding the conduct. An intent may be inferred from circumstantial evidence.

"Recklessness. A person acts recklessly with respect to a result or a circumstance when the defendant is aware of and consciously disregards a substantial and unjustifiable risk. The risk must be of such a nature and degree that disregarding it constitutes a gross deviation from the standard of conduct that a reasonable person, that's another objective standard, that a reasonable person would observe in the situation.

"The standard of conduct of a reasonable person in the same situation as the defendant is the doing of something that a reasonably prudent person would do under the circumstances or omitting to do what a reasonably prudent person would not do.

"So a gross deviation is a great or a substantial deviation, not just a slight or a moderate deviation. There must be a great or substantial difference between, on the one hand, the defendant's conduct and disregarding a substantial and unjustifiable risk and, on the other hand, what a reasonable person would have done under the circumstances.

"Whether a risk is substantial or unjustifiable is a question of fact for you to determine under the circumstances. So, again, the defense of duress shall

should have instructed the jury that the defendant's age essentially is a categorical distinction that is relevant to the determination of criminal liability, independent of how it relates to the ages of his alleged coercers, Stokely and Thorne. Specifically, he claims that the recognized differences between juveniles and adults should be taken into account when assessing the proper standard by which to judge the defendant's actions in conjunction with his defense of duress. According to the defendant, the court improperly failed to instruct the jury that it could factor his age into the defense, with an eye toward accounting for the differences in how adolescents evaluate risks.[15] We disagree.

It is well established that General Statutes § 53a-14[16] provides that duress is a defense to a crime. See *State v. Rouleau*, 204 Conn. 240, 243, 249, 528 A.2d 343 (1987). The right of a defendant charged with a crime to establish a defense is a fundamental element of due process. *Washington v. Texas*, 388 U.S. 14, 19, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967); *State v. Miller*, 186 Conn. 654, 660, 443 A.2d 906 (1982). "This fundamental constitutional right includes proper jury instructions on the burden of proof on the defense of duress so that the jury

---

not be available to a person who intentionally or recklessly places [himself] in a situation in which it is probable he will be subjected to duress."

[15] The state contends that there was insufficient psychological and medical evidence in the record upon which a jury could have assessed the ability of an adolescent to resist pressures based on a limited decision-making capacity and a susceptibility to outside influences. The trial court, however, expressly noted recent legal debate concerning what standards to apply to young adolescents and rejected any attempt to include that discussion in its instructions as a matter of law.

[16] General Statutes § 53a-14 provides: "In any prosecution for an offense, it shall be a defense that the defendant engaged in the proscribed conduct because he was coerced by the use or threatened imminent use of physical force upon him or a third person, which force or threatened force a person of reasonable firmness in his situation would have been unable to resist. The defense of duress as defined in this section shall not be available to a person who intentionally or recklessly places himself in a situation in which it is probable that he will be subjected to duress."

may ascertain whether, under all the circumstances, the state has met its burden of proving beyond a reasonable doubt that the crimes charged were not committed under duress. Duress . . . [is a] recognized [defense] to [a] criminal [charge] because [it] . . . implicate[s] the volitional aspect of criminality. *State* v. *Pierson*, 201 Conn. 211, 217, 514 A.2d 724 (1986) [on appeal after remand, 208 Conn. 683, 546 A.2d 268 (1988), cert. denied, 489 U.S. 1016, 109 S. Ct. 1131, 103 L. Ed. 2d 193 (1989)]; see *State* v. *Miller*, supra, 660–61. The state's burden of proof beyond a reasonable doubt encompasses, in an appropriate case, a burden of disproving duress beyond a reasonable doubt. See General Statutes § 53a-12 (a); see also *State* v. *Pierson*, supra [217]; *State* v. *Fuller*, 199 Conn. 273, 278, 506 A.2d 556 (1986); *State* v. *Miller*, supra [661]." *State* v. *Rouleau*, supra, 204 Conn. 243.

The defendant's right, however, as a matter of law to a theory of defense instruction exists only when there is evidence indicating the availability of the defense. "The court . . . has a duty not to submit to the jury, in its charge, any issue upon which the evidence would not reasonably support a finding." *State* v. *Diggs*, 219 Conn. 295, 299, 592 A.2d 949 (1991); see *State* v. *Williams*, 202 Conn. 349, 364, 521 A.2d 150 (1987). "Until something in the evidence indicates the contrary, the court may presume the defendant intended the prohibited bodily movements that constitute the offense and that he has acted under no duress, unlawful inducement in the nature of entrapment, or lack of requisite mental capacity." *State* v. *Pierson*, supra, 201 Conn. 218. In reviewing the defendant's claim that he was entitled to instructions on duress as defined in § 53a-14, we look at the evidence in a light most favorable to his claim. See *State* v. *Fuller*, 199 Conn. 273, 279, 506 A.2d 556 (1986).

In the present case, the trial judge concluded that there was evidence that justified such an instruction and provided the jury with several instructions, which the defendant claims were deficient. Therefore, we turn to our well settled standard of review of jury instructions. "When reviewing [a] challenged jury instruction . . . we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper. . . . [I]n appeals involving a constitutional question, [the standard is] whether it is reasonably possible that the jury [was] misled. . . . In determining whether it was . . . reasonably possible that the jury was misled by the trial court's instructions, the charge to the jury is not to be critically dissected for the purpose of discovering possible inaccuracies of statement, but it is to be considered rather as to its probable effect upon the jury in guiding [it] to a correct verdict in the case. . . . The charge is to be read as a whole and individual instructions are not to be judged in artificial isolation from the overall charge. . . . The test to be applied . . . is whether the charge, considered as a whole, presents the case to the jury so that no injustice will result." (Internal quotation marks omitted.) *State* v. *Reid*, 254 Conn. 540, 559, 757 A.2d 482 (2000).

We begin with § 53a-14, under which the legislature has prescribed: "[I]t shall be a defense that the defendant engaged in the proscribed conduct because he

was coerced by the use or threatened imminent use of physical force upon him or a third person, which force or threatened force a person of reasonable firmness in his situation would have been unable to resist. The defense of duress . . . shall not be available to a person who intentionally or recklessly places himself in a situation in which it is probable that he will be subjected to duress." "Duress . . . excuses a crime when another's unlawful threat of death or serious bodily injury reasonably causes the defendant to do a criminal act in a situation in which there was no other opportunity to avoid the threatened danger." *United States* v. *Michelson*, 559 F.2d 567, 569 (9th Cir. 1977); accord *United States* v. *McClain*, 531 F.2d 431, 438 (9th Cir.), cert. denied, 429 U.S. 835, 97 S. Ct. 102, 50 L. Ed. 2d 101 (1976). " 'The rationale of the defense is not that the defendant, faced with the unnerving threat of harm unless he does an act which violates the literal language of the criminal law, somehow loses his mental capacity to commit the crime in question . . . [but] rather it is that, even though he has done the act the crime requires . . . his conduct which violates the literal language of the criminal law is justified because he has thereby avoided a harm of greater magnitude.' 1 W. LaFave & A. Scott, Substantive Criminal Law [(1986) § 5.3 (a), pp. 614–15]." *State* v. *Rouleau*, supra, 204 Conn. 248–49. In speaking to the defenses of duress and necessity, the United States Supreme Court has stated: "Under any definition of these defenses one principle remains constant: if there was a reasonable, legal alternative to violating the law, 'a chance both to refuse to do the criminal act and also to avoid the threatened harm,' the defenses will fail. [W. LaFave & A. Scott, Criminal Law (1972) § 49, p. 379]." *United States* v. *Bailey*, 444 U.S. 394, 410, 100 S. Ct. 624, 62 L. Ed. 2d 575 (1980).

Connecticut's duress defense has both a subjective and an objective component. The subjective component

is that the defendant actually must have been coerced into the criminal action. See General Statutes § 53a-14 ("[the defendant] was coerced by the use or threatened imminent use of physical force upon him or a third person"). This requirement has been described as subjective because the defendant in fact must have believed that his life would be endangered if he did not perform the criminal act at issue. That assessment necessarily takes into account the defendant's state of mind. In other words, the defendant must have believed in and been frightened by the likelihood of the threatened harm because the defense of duress rests on principles of necessity. Stated conversely, the subjective aspect becomes more apparent: even if an *ordinary* person could not have resisted the coercive threat, if the *particular* defendant did not believe that he was in danger, then the defense of duress would not be available. The language requiring that the defendant in fact believed that his life was endangered is part of the duress defense to ensure that the defense "is not available to a defendant who did not in fact believe that his life was endangered even though a reasonable man might have thought so." *State* v. *Starks*, 122 Ariz. 531, 533, 596 P.2d 366 (1979). Therefore, the sincerity of the defendant's asserted perception of an imminent threat of harm must be scrutinized by the jury.

The second component of the defense is objective in nature. If the defendant can establish that he was in fact in fear, his conduct is then judged by an objective standard. See General Statutes § 53a-14 ("which force or threatened force a person of reasonable firmness in his situation would have been unable to resist"). A defendant's level of resistance to the particular threat must meet community standards of reasonableness. In other words, the jury must conclude that the defendant's belief was a reasonable one. "[T]he normative component of duress assures that the coerced actor

demonstrated the degree of fortitude expected of a member of the morally responsible community. In other words, even though the legally coerced actor failed to do the right thing, [his or] her act is nevertheless tolerated because [he or] she 'attained . . . society's legitimate expectations of moral strength.'" L. Dore, "Downward Adjustment and the Slippery Slope: The Use of Duress in Defense of Battered Offenders," 56 Ohio St. L.J. 665, 746 (1995). In deciding whether the defendant's perceptions were reasonable, the jury must consider objectively a variety of factors including the seriousness of the threat, the nature of the impending harm being threatened, the opportunities for escape and the seriousness of the crime the defendant has committed.

The jury's evaluation of a defendant's response to the threat, applying the standard of the "person of reasonable firmness," presupposes an ordinary person without serious mental and emotional defects. See *State v. Van Dyke*, 361 N.J. Super. 403, 417, 825 A.2d 1163 (App.) (recognizing duress as establishing standard "measured by the societal objective norm of the person of reasonable firmness rather than by the [particular attributes] which characterize [the] defendant"), cert. denied, 178 N.J. 35, 834 A.2d 407 (2003). A defendant's personal timidity or lack of firmness in the face of intimidation does not serve as the measure for his or her conduct under this second component of the defense. Id., 414–15. Community expectations prevail in judging a defendant's response to a threat when that response involves engaging in criminal action toward, or affecting, an innocent third person. With the defense of duress, a defendant is neither held to a standard of heroism, nor is the defendant allowed to rely on his or her idiosyncratic mental and emotional weaknesses.[17]

---

[17] We note, however, that, although the standard of a person of reasonable firmness is operative, denying the defense to those who are too easily coerced, and "the trier of fact is not to consider the defendant's particular

"Earnest resistance is a generalized standard; it is not measured by a defendant's individual personality traits." *State* v. *VanNatta*, 149 Or. App. 587, 591, 945 P.2d 1062, cert. denied, 326 Or. 234, 952 P.2d 61 (1997).

The explanatory note to the Model Penal Code section on duress, on which § 53a-14 is modeled, explains: "The standard is thus partially objective; the defense is not established simply by the fact that the defendant was coerced; he must have been coerced in circumstances under which a person of reasonable firmness *in his situation* would likewise have been unable to resist." (Emphasis added.) 1 American Law Institute, Model Penal Code and Commentaries (1985) § 2.09, explanatory note, p. 367 (Model Penal Code). In other words, "[t]he standard is not . . . wholly external in its reference; account is taken of the actor's 'situation,' a term that should here be given the same scope it is accorded in appraising recklessness and negligence. Stark, tangible factors that differentiate the actor from another, like his size, strength, age, or health, would be considered in making the exculpatory judgment. Matters of temperament would not." Id., § 2.09, comment 3, p. 375. As other courts that follow the Model Penal Code have explained, "[t]he idiosyncratic ability of a defendant not to withstand a particular coercive threat does not control. That person's subjective psychological incapacity to resist a coercive threat does not set the bar. Rather, in keeping with the normative function of duress, '[t]he coercive threat must be sufficiently grave and severe as to similarly coerce a nonheroic, but reasonably firm, person into criminal conduct.' " *State* v. *B. H.*, 183 N.J. 171, 191, 870 A.2d 273

---

characteristics of temperament, intelligence, courageousness, or moral fortitude, the fact that a defendant suffers from 'a gross and verifiable' mental disability 'that may establish irresponsibility' is a relevant consideration." *Commonwealth* v. *DeMarco*, 570 Pa. 263, 272–73, 809 A.2d 256 (2002); id., 274–75 (evidence that defendant was borderline mentally retarded and living with coercer was salient situational factor).

(2005). "The phrase 'person of reasonable firmness' is employed in the duress disability to emphasize the characteristic of the reasonable person that is most relevant." *Marx* v. *State*, 291 Ark. 325, 332, 724 S.W.2d 456 (1987). The objective component of duress is necessary to ensure conformity and reflects society's "unwillingness to vary legal norms with the individual's capacity to meet the standards they prescribe, absent a disability that is both gross and verifiable . . . ." 1 Model Penal Code, supra, § 2.09, comment 2, p. 374. Therefore, we ask the jury to evaluate whether a special circumstance, a threat or use of force, for which the defendant is not responsible, caused his conduct, and would have induced the same conduct by a reasonable person in the defendant's situation.

As we previously have noted, in assessing the defense of duress, it is important to remember that, pursuant to the defense, the criminal act is justified because the defendant has avoided a harm of greater magnitude. See *State* v. *Rouleau*, supra, 204 Conn. 248–49 ("[t]he rationale of the defense [of duress] is not that the defendant, faced with the unnerving threat of harm unless he does an act which violates the literal language of the criminal law, somehow loses his mental capacity to commit the crime in question . . . [but] rather it is that, even though he had done the act the crime requires, his conduct which violates the literal language of the criminal law is justified because he has thereby avoided a harm of greater magnitude" [internal quotation marks omitted]). Thus, although the factors considered in determining the defendant's *situation,* i.e., those that differentiate him from his coercer, such as size, strength, age or health, are somewhat individualized, they do not stand in isolation. Rather, they are to be gauged against the coercer in order to determine whether the defendant acted reasonably and therefore justifiably. Consequently, the trier of fact must consider

any salient situational factors surrounding the defendant at the time of the alleged duress, including the severity of the offense the defendant was asked to commit, the nature of the force used or threatened to be used, and the alternative ways in which the defendant may have averted the force or threatened force. See J. Dressler, "Exegesis of the Law of Duress: Justifying the Excuse and Searching for Its Proper Limits," 62 S. Cal. L. Rev. 1331, 1367 (1989) (noting "line drawing" nature of duress and that "[a]ll that can be said with certainty is that, assuming the threat remains constant, our willingness to excuse an actor doubtlessly recedes as the offense becomes more heinous" and that only "[s]ome, but not all, persons who are forced into a corner and wrongfully choose to harm innocent persons rather than accept the threatened consequences will be excused").

Finally, even where the evidence is sufficient to establish the elements of duress, the defendant still may not be entitled to avail himself of the defense. Duress is not a refuge. The duress defense is not available if the evidence establishes that the defendant recklessly placed himself in a situation where it was probable that he would be subject to duress. "Recklessly" in this context has been defined to mean: "A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and intent of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation. . . . Therefore, like the test for determining whether the defendant was subject to duress, the test for determining whether a defendant acted recklessly . . . is a hybrid objective-

subjective one. . . . The trier of fact must decide whether the defendant disregarded a risk that involves a gross deviation from what an objective reasonable person would observe if he was placed in the [defendant's] situation. . . . Thus, in making its determination, the trier of fact must again take into account the stark tangible factors that differentiate the defendant from another person and the salient situational factors surrounding the defendant." (Citations omitted; internal quotation marks omitted.) *Commonwealth* v. *DeMarco*, 570 Pa. 263, 273–74, 809 A.2d 256 (2002).

Turning to the present case, the defendant recognizes that the trial court instructed the jury that his age could be used to differentiate him from those threatening him. Expressly, the trial court told the jury that it could "take into account age as one of the tangible factors that go to assessing the situation; that is, the comparative situation between the two actors or the three actors, the defendant on the one hand and those threatening on the other." The defendant claims, however, that the jury should have been instructed that his age also was a factor to determine how he would have perceived the threat. Specifically, he contends that this court should recognize the differences between a juvenile and an adult in maturity, sense of responsibility, vulnerability and personality traits, which make it more difficult for adolescents to resist pressures because of their limited decision-making capacity and their susceptibility to outside influences. Essentially, the defendant seeks an instruction that would have allowed the jury to factor his age into the defense, independent and regardless of how it relates to the age of his coercers, with an eye toward accounting for the differences in how adolescents evaluate risks.[18]

---

[18] The defendant also makes this claim in connection with that portion of the trial court's instructions that the defense of duress is not available to a person who intentionally or recklessly places himself in a situation in which it is probable that he will be subjected to duress. See footnotes 11 and 14 of this opinion. He claims that, in order for the jury to decide whether

As support for this contention, the defendant relies on cases recognizing the age of the defendant as a factor in determining whether a confession or waiver of a constitutional right was voluntary. See, e.g., *Withrow* v. *Williams*, 507 U.S. 680, 693, 113 S. Ct. 1745, 123 L. Ed. 2d 407 (1993) (defendant's maturity factor in voluntariness of confession); *Schneckloth* v. *Busta-monte*, 412 U.S. 218, 226, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973) (age of defendant taken into consideration in determining if consent to search was voluntary). He also directs us to *Roper* v. *Simmons*, 543 U.S. 551, 568–69, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005), in which the United States Supreme Court held that juveniles under the age of eighteen could not receive the death penalty because they have a diminished culpability stemming from various differences between them and adults due to their lack of maturity.

We understand the defendant's plea, acknowledge that juveniles often have more immature decision-making capability and recognize the literature supporting the notion that juveniles are more vulnerable to all sorts of pressure, including, but not limited to, duress.[19] The

the defendant subjectively had realized the risk of a particular result or circumstance and consciously chose to ignore it, the trial court should have told the jury to consider the "defendant's juvenile status." We conclude that the trial court properly declined to instruct the jury to consider the defendant's age as it pertains to this aspect of the defense for the same reasons stated in part I of this opinion.

[19] The amici curiae, the Juvenile Law Center and the National Juvenile Defender Center, in their brief to this court in support of the defendant, aptly summarize the research in the field as to this issue: "Experts in adolescent development . . . explain children's immature decision-making capabilities. First, youth may lack the ability to exercise sufficient impulse control. 'The teen years are periods when self-control issues are confronted on a series of distinctive new battlefields. . . . New domains . . . require not only the cognitive appreciation of the need for self-control in a new situation but also its practice.' [F.] Zimring, 'Penal Proportionality for the Young Offender: Notes on Immaturity, Capacity, and Diminished Responsibility' in Youth on Trial: A Developmental Perspective on Juvenile Justice 280 ([T]. Grisso and [R.] Schwartz eds., 2000) . . . . A child faced with a new type of situation may therefore have more difficulty exercising the necessary

flaw with the defendant's proposal, however, is that, carried to its logical conclusion, it essentially would require this court to rewrite the entire Penal Code, crimes and defenses, to necessitate consideration of the age of young offenders for the ultimate purpose of

self-control than a more experienced adult. Similarly, while adults may perceive multiple options in a particular situation, adolescents may perceive only one, further limiting their understanding of how to escape a coercive situation. [M.] Beyer, 'Immaturity, Culpability [and] Competency in Juveniles: A Study of 17 Cases,' 15 Crim. Just. 27, 27 (2000) . . . [M.] Beyer, 'Recognizing the Child in the Delinquent,' 7 Ky. Child. Rts. J. 16, 17–18 (1999) . . . . Finally, because adolescents tend to discount the future and weigh more heavily the short-term risks and benefits, they may experience heightened pressure from the immediate coercion they face. See [E.] Scott, [N.] Repucci & [J.] Woolard, 'Evaluating Adolescent Decision Making in Legal Contexts,' 19 L. & Hum. Behav. 221, 231 (1995) . . . .

"Recent research on brain development demonstrates that structural distinctions between the adult and adolescent brain account for differences in how adolescents evaluate risks and rewards. [N.] Chernoff & [M.] Levick, 'Beyond the Death Penalty: Implications of Adolescent Development Research for the Prosecution, Defense and Sanctioning of Youthful Offenders,' Clearinghouse Rev., J. of Poverty L. & [Policy] 209, 210 (2005) . . . . Specifically, the prefrontal cortex which manages long-term planning, self-regulation, and the assessment of risk 'continues to develop and change through the course of adolescence.' Id., 210. Adolescent decision making is therefore distinguished by not only cognitive and psychosocial, but also neurological deficits. Id.

"These developmentally normal impairments in making decisions can be exacerbated when adolescents are under stress. Because adolescents have less experience with stressful situations than adults, they have a lesser capacity to respond adeptly to such situations. See [L.] Steinberg & [R.] Schwartz, 'Developmental Psychology Goes to Court' in Youth on Trial [A Developmental Perspective on Juvenile Justice, supra, 26] (explaining that even when older adolescents attain raw intellectual abilities comparable to those of adults, their relative lack of experience may impede their ability to make sound decisions) . . . . Additionally, adolescents' tendency to process information in an 'either-or' capacity is exacerbated in stressful situations. See [M. Beyer, supra, 15 Crim. Just. 27; M. Beyer, supra, 7 Ky. Child. Rts. 17–19]. Thus a young person experiencing coercion may have particular difficulties recognizing the option of exiting the situation." See also L. Steinberg & E. Scott, "Less Guilty by Reason of Adolescence: Developmental Immaturity, Diminished Responsibility, and the Juvenile Death Penalty," 58 Am. Psychologist 1009, 1014 (2003) ("[a]s legal minors, [juveniles] lack the freedom that adults have to extricate themselves from a criminogenic setting").

defining their culpability based on their vulnerability and susceptibility to negative influences and outside pressures.[20]

The legislature's determination to treat sixteen year olds as adults and to treat adolescents under sixteen as juveniles for purposes of assessing criminal responsibility reflects its appreciation of the different mental abilities and susceptibilities of younger persons.[21] To adopt the argument of the defendant would usurp the legislature's role and require this court to vitiate what is an inherently legislative determination that sixteen year olds are to be treated like adults for purposes of criminal liability.[22] The categorization of offenses is a legislative judgment, and, generally speaking, "it is not the prerogative of courts in this area lightly to launch an inquiry to resolve a debate which has already been settled in the legislative forum." (Internal quotation marks omitted.) *State* v. *O'Neill*, 200 Conn. 268, 288, 511 A.2d 321 (1986); accord *State* v. *Hernandez*, 204

[20] Even if we were to view the defendant's claim without consideration of its broader implications, he could not prevail. We have limited the objective component of the duress defense to "[s]tark, tangible factors that differentiate the actor from another, like his size, strength, age or health . . . ." 1 Model Penal Code, supra, § 2.09, comment 3, p. 375. "Earnest resistance is a generalized standard; it is not measured by a defendant's individual personality traits." *State* v. *VanNatta*, supra, 149 Or. App. 591. Unless a defendant establishes that he suffers from a *"gross and verifiable"* mental disability; (emphasis added) 1 Model Penal Code, supra, § 2.09, comment 2, p. 374; that may establish lack of responsibility, he is confined to the normative function of duress.

[21] Indeed, had the defendant in the present case been a juvenile, his confession would have been inadmissible unless: (1) a parent was present during the interview; and (2) he and his parent had been advised of his right to counsel and his right to remain silent. General Statutes § 46b-137 (a).

[22] The fact that the legislature currently is considering amending the Penal Code to treat sixteen and seventeen year olds as delinquents reflects its recognition of the differences in maturity, sense of responsibility, vulnerability and personality traits between a juvenile and an adult. See Raised Senate Bill No. 1196, 2007 Sess., entitled: "An Act Concerning the Age of a Child for Purposes of Jurisdiction in Delinquency Matters and Proceedings."

Conn. 377, 387, 528 A.2d 794 (1987); *State* v. *Rao,* 171 Conn. 600, 603, 370 A.2d 1310 (1976). We defer to the broad authority that legislatures possess in determining the types and limits of punishment for crimes. Indeed, "[i]n examining the rationality of a legislative classification, we are bound to defer to the judgment of the legislature unless the classification is clearly irrational and unreasonable." *State* v. *Dupree,* 196 Conn. 655, 665, 495 A.2d 691, cert. denied, 474 U.S. 951, 106 S. Ct. 318, 88 L. Ed. 2d 301 (1985); *State* v. *Simmat,* 184 Conn. 222, 224, 439 A.2d 915 (1981); see, e.g., *State* v. *Smith,* 273 Conn. 204, 212–13, 869 A.2d 171 (2005) (noting that "[o]ur state law reflects a legislative determination that cocaine is a dangerous drug, particularly when consumed by a young person" and that numerous statutes prohibit its possession, sale, transport and like conduct); *State* v. *Ledbetter,* 263 Conn. 1, 17, 818 A.2d 1 (2003) (legislative determination not to extend the protections of General Statutes § 46b-137 [a], which provides conditions under which confession of child may be admissible, to child who, after being subjected to custodial interrogation, is prosecuted as adult); *State* v. *Henton,* 50 Conn. App. 521, 538, 720 A.2d 517 (sentence enhancement, such as that authorized under General Statutes § 53-202k for commission of class A, B or C felony with firearm, is valid legislative determination), cert. denied, 247 Conn. 945, 723 A.2d 322 (1998). Accordingly, the defendant cannot prevail on his first claim of instructional impropriety.

II

The defendant also claims that the trial court improperly instructed the jury on accessorial liability. Specifically, he claims that the trial court's instructions on the issue of intent were deficient. The defendant concedes that he did not provide a written request to charge on accessorial liability, nor did he take exception to the court's charge and, therefore, this claim is unpreserved.

Accordingly, he seeks to prevail under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[23] The defendant has satisfied the first two prongs of *Golding* because an adequate record exists and "[a]n improper instruction on a defense, like an improper instruction on an element of an offense, is of constitutional dimension." (Internal quotation marks omitted.) *State* v. *Lemoine*, 256 Conn. 193, 198–99, 770 A.2d 491 (2001). His claim fails under the third prong of *Golding*, however, because he has not demonstrated that the alleged constitutional violation exists.

As we noted in part I of this opinion, "[w]hen reviewing [a] challenged jury instruction . . . we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. . . . [T]he test . . . is . . . whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper. . . . [I]n appeals involving a constitutional question, [the standard is] whether it is reasonably possible that the jury [was] misled. . . . The test to be applied . . . is whether the charge, considered as a whole, presents the case to the

---

[23] In *State* v. *Golding*, supra, 213 Conn. 239–40, this court held "that a defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail. The appellate tribunal is free, therefore, to respond to the defendant's claim by focusing on whichever condition is most relevant in the particular circumstances."

jury so that no injustice will result." (Internal quotation marks omitted.) *State* v. *Reid*, supra, 254 Conn. 559.

The statutory provision governing accessorial liability is General Statutes § 53a-8 (a), which provides: "A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender." This court previously has stated that "a conviction under § 53a-8 requires [the state to prove the defendant's] dual intent . . . [first] that the accessory have the intent to aid the principal and [second] that in so aiding he intend to commit the offense with which he is charged." (Internal quotation marks omitted.) *State* v. *Turner*, 252 Conn. 714, 748, 751 A.2d 372 (2000). Additionally, "one must knowingly and wilfully assist the perpetrator in the acts which prepare for, facilitate or consummate it." (Internal quotation marks omitted.) *State* v. *Robertson*, 254 Conn. 739, 783, 760 A.2d 82 (2000).

In the present case, the defendant was charged as an accessory to robbery in the second degree, burglary in the first degree, larceny in the second degree and accessory to stealing a firearm. The trial court's instructions tracked § 53a-8 correctly and properly articulated the requisite dual intents.[24] The defendant claims, how-

---

[24] The trial court initially instructed the jury as follows: "What a person's purpose or intention has been is very largely a matter of inference. The only way in which a jury can determine what a person's purpose or intention was at any given time, aside from that person's own testimony, is by determining what the person's conduct was and what the circumstances were surrounding that conduct, and from those reasonable inferences as to what his purpose or intention was.

"In other words, it is not necessary to establish that the defendant and the defendant's alleged coconspirators signed papers, shook hands or uttered words that we have an agreement, but rather, a conspiracy can be inferred from the conduct of the accused. The permissible inference in no way,

ever, that the trial court acted improperly in not, sua

however, shifts the state's burden of proving the element beyond a reasonable doubt.

"In terms of being an accessory or accomplice. When I get to the elements of crimes, insofar as determining whether or not somebody is an accessory or an accomplice, the underlying crime to which somebody may have been an accessory or an accomplice can be committed by another offender. Okay. That's why you're an accessory. And so the—a person is guilty of a crime even because he is the principal offender or because he is an accessory. Under the law, an accessory is guilty just as if he were the principal offender. Being [an] accessory is not a crime in and of itself, but it is only another way of committing the underlying crime.

"The criminal responsibility of an accessory is provided by [§ 53a-8] of the Connecticut Penal Code which says: 'A person acting with the mental state required for commission of an offense who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender.'

"I emphasize to you that this statute does not connect those five acts with the word 'and,' but separates them by 'or.' So a person is an accessory if he solicits or requests or commands or importunes or intentionally aids another person to engage in conduct that constitutes an offense.

"Aid means to assist, help or support. Also, a person acts intentionally with respect to conduct when his conscious objective is to cause such a result or to engage in such conduct.

"Intentionally aid, therefore, means to act in any manner, the conscious objective of which is to assist, help or support.

"In order to be an accessory under that statute, a person must not only intentionally aid another person to engage in conduct that constitutes an offense, but he must also commit one of [these acts] specified with the same mental state required for commission of the underlying crime and share the same unlawful purpose or purposes in common with the person who actually commits the crime.

"It is not enough that a person committed acts specified in this statute that, in fact, aided the actual perpetration of a crime. He must also have the same mental state and purpose to be guilty of the crime, as does the actual perpetrator.

"In order to prove the defendant guilty as an accessory to a crime charged in any count, the state has the burden to prove that the defendant with the requisite mental state, either—excuse me—with the requisite mental state intentionally aided another person who actually committed the crime charged in that count."

Thereafter, during its deliberations, the jury inquired: "Did the defendant have to actually have 'displayed and threatened the use of what he represented by his words or conduct to be a deadly weapon,' to constitute the charge of robbery or just be present when another individual 'displayed and

sponte, including specific language from D. Borden & L. Orland, 5 Connecticut Practice Series: Connecticut Criminal Jury Instructions (3d Ed. 2001) § 5.3.[25] Although that language is a correct statement, it is not the only proper way to convey the necessary information to the jury. See *State* v. *Peters*, 40 Conn. App. 805, 823, 673 A.2d 1158 (jury charge not improper for failure to recite "talismanic words"), cert. denied, 237 Conn. 925, 677 A.2d 949 (1996).

Additionally, the defendant claims that his duress defense, if credited, "negated" the requisite mental states for the charged offenses because it meant that none of his actions had been done with criminal intent and community of unlawful purpose. Therefore, according to the defendant, the trial court was required

---

threatened the use of what he represented by his words or conduct to be a deadly weapon?' " And, "[w]hat is the difference between the crime of robbery and accessory to the crime of robbery?"

The court then provided the following additional instructions: "And the answer to that question is that he himself—he himself did not have to display. The third party could have, okay.

"I know that the information you have charging their reason, they're conjunctive, but the statute reads differently, and that's just a technical problem in terms of the charging.

"But he himself did not have to represent—display or threaten the use of the weapon. He could have just been present. So that makes what the difference between crime or robbery is that you can be in the room not— just be present and be charged with robbery, okay.

"Accessory, you could be an accessory to robbery and still not be in the room but having aided, importuned, solicited in some way the commission of the robbery even though you were not present in the room for the robbery."

[25] Specifically, the defendant claims that the trial court should have told the jury the following: "One who is present when a crime is committed but neither assists in its commission nor shares in the criminal intent of its perpetrator cannot be convicted as an accessory. Mere presence as an inactive companion, passive acquiescence, or the doing of innocent acts which may in fact aid the one who commits the crime must be distinguished from the criminal intent and community of unlawful purpose shared by one who knowingly and wilfully assists the perpetrator of the offense in the acts which prepare for, facilitate, or consummate it." *State* v. *Laffin*, 155 Conn. 531, 536, 235 A.2d 650 (1967); see D. Borden & L. Orland, supra, § 5.3, p. 378.

to remind the jury that the defendant, by his defense of duress, was not conceding anything and that the jury had to be vigilant in its duty to evaluate whether the state had proven each essential element beyond a reasonable doubt. We disagree.

First, as we stated in *State* v. *Rouleau,* supra, 204 Conn. 248–49, " '[t]he rationale of the defense [of duress] is not that the defendant, faced with the unnerving threat of harm unless he does an act which violates the literal language of the criminal law, somehow loses his mental capacity to commit the crime in question . . . [but] rather it is that, even though he had done the act the crime requires, his conduct which violates the literal language of the criminal law is justified because he has thereby avoided a harm of greater magnitude.' 1 W. LaFave & A. Scott, [supra, Substantive Criminal Law, § 5.3 (a), pp. 614–15]." See *State* v. *Boone,* 15 Conn. App. 34, 40, 544 A.2d 217, cert. denied, 209 Conn. 811, 550 A.2d 1084 (1988). "Under *Rouleau,* therefore, because a finding of duress does not negate the element of specific intent for the crime charged, specific intent and duress can coexist." *State* v. *Aponte,* 66 Conn. App. 429, 439, 784 A.2d 991 (2001), cert. denied, 259 Conn. 907, 789 A.2d 995 (2002). Second, the trial court was inordinately careful to ensure that the jury understood its constitutional obligations.[26] Accordingly, the trial court's instructions were not inadequate.

The judgment is affirmed.

In this opinion the other justices concurred.

---

[26] Indeed, the back and forth between the trial court and the jury in connection with the duress defense; see footnotes 11 through 14 of this opinion and the accompanying text; demonstrates the commitment by both the court and the jury to determine properly whether the state had proven all of the essential elements of the charged offenses beyond a reasonable doubt.