******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ESPINOSA, J., dissenting. I disagree with the majority that the decision of the United States Supreme Court in *Miller* v. *Alabama,* U.S. , 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012), applies under the facts of the present case. As I explained in my dissenting opinion in *State* v. *Riley*, 315 Conn. 637, 664, A.3d (2015), *Miller* applies only to mandatory sentencing schemes. Accordingly, because Connecticut's sentencing scheme allows a judge to exercise discretion in determining whether to sentence a juvenile offender to life without the possibility of parole, *Miller* does not apply at all to our sentencing scheme. Even if I had agreed with the majority in *Riley* that *Miller* applied to Connecticut's discretionary sentencing scheme; id., 653; I would not agree, however, that *Miller* applies in the present case for the simple reason that it applies only to sentences of life without the possibility of parole. Because the sentence of the petitioner, Jason Casiano, is one for a term of years—fifty years of incarceration—*Miller* does not apply. Accordingly, I would affirm the judgment of the habeas court granting the motion for summary judgment filed by the respondent, the Commissioner of Correction, and, therefore, I respectfully dissent.

As a threshold matter, because I conclude that *Miller* applies only to sentences of life without the possibility of parole, I need not address the question of whether *Miller* applies retroactively. I fully agree, however, with Justice Zarella's well reasoned analysis in his dissent in the present case explaining that *Miller* is not retroactive because it did not announce a watershed rule of criminal procedure pursuant to *Teague* v. *Lane*, 489 U.S. 288, 301, 109 S. Ct. 1060, 103 L. Ed. 2d 334 (1989). Rather, as Justice Zarella explains, the implementation of *Miller* "represents an incremental step" in Connecticut's sentencing laws and procedures affording defendants the protection of due process. Justice Zarella's discussion of the statutory provisions governing the creation and utilization of the presentence investigation report is particularly enlightening, as it demonstrates that when the petitioner was sentenced in 1997, years before *Miller* was decided, our sentencing scheme already required judicial consideration of many of the factors that the United States Supreme Court focused on in *Miller*. Indeed, as Justice Zarella explains thoroughly, the sentencing judge in the present case considered the petitioner's presentence investigation report, which was very detailed, and described at length the petitioner's upbringing, his educational background, behavioral problems, previous offenses, his supportive and stable family environment, his leading role in the vicious murder of an innocent victim, and many of the other factors discussed in *Miller*. I conclude, based on Justice Zarella's detailed discussion of the petitioner's presentence

investigation report and sentencing procedure, that the petitioner already has received every protection dictated by *Miller*. As I explain in this dissent, however, those protections, although required by Connecticut law and provided to the petitioner in the present case, are not mandated by the eighth amendment to the United States constitution.

The majority's application of *Miller* to the present case cannot be reconciled with the trilogy of cases governing the constitutional limits placed on the punishment of juvenile offenders, *Roper* v. *Simmons*, 543 U.S. 551, 568, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005), *Graham* v. *Florida*, 560 U.S. 48, 75, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010), and *Miller* v. *Alabama*, supra, 132 S. Ct. 2458. The United States Supreme Court has limited the scope of those three decisions to the two most extreme punishments available under our criminal justice system—execution, and life without the possibility of parole. That narrow scope is evident in: (1) the structure of the trilogy, which reveals an unmistakable and carefully considered progression; (2) the substantive analysis in *Graham*, which limits the sentencing practice at issue in both *Graham* and *Miller* to life without the possibility of parole; and (3) the language that both *Graham* and *Miller* use in discussing the sentence of life without the possibility of parole. Moreover, as I explain in this dissent, extending *Miller* to sentences for a lengthy term of years yields different results in different jurisdictions, calling into question the ability of courts to apply the rule in a manner comporting with principles of fundamental fairness. Finally, the majority's extension of *Miller* cannot be reconciled with Connecticut's statutes, which define the sentence of life without the possibility of release to preclude even the possibility that a defendant will be released from prison within his natural lifetime.

The structure of the trilogy of cases reveals the measured steps that the Supreme Court has taken in marking the limits that the eighth amendment places on the punishments that may be imposed on juvenile offenders. The court took its first and biggest step in *Roper*, categorically barring the imposition of the death penalty as to all juveniles. *Roper* v. *Simmons*, supra, 543 U.S. 568. After *Roper*, however, the steps have become increasingly smaller. This progression makes sense, because in *Graham* and *Miller* the court essentially has been defining the outer limits of the rule that it announced in *Roper*, that the principles justifying the imposition of the most extreme punishments apply differently to children. Id., 570–71.

In *Roper*, *Graham*, and *Miller*, the court calibrated the breadth of its rules quite carefully by controlling the specific variables affected by each incremental change. That is, the rule in each of the three decisions was defined by three variables—the type of punishment

affected by the rule, the class of juveniles to which the rule would apply, and the type of bar imposed by the rule, categorical or one merely imposing procedural limits. In each decision, the court meticulously delineated the extent to which each of the variables would be affected by the articulated rule. First, the court in *Roper* set forth a bar on the execution of any juvenile offender. Id., 568. Although the court's rule was broad in the sense that it imposed a categorical bar, and applied it to all juveniles, it was also extremely narrow in that its scope was limited to one type of punishment—execution. Id. The step that the court took in *Graham* was smaller. The court in *Graham* extended the application of the bar only to include one additional type of sentence, the second most extreme punishment available in our criminal justice system, a sentence of life without the possibility of parole. *Graham* v. *Florida*, supra, 560 U.S. 74. The court in *Graham* also limited the subset of juveniles to which the extended categorical bar applied, confining its rule to juveniles convicted of crimes other than homicide. Id. Finally, in *Miller* the court prohibited the mandatory imposition of life imprisonment without the possibility of parole on juveniles convicted of homicide. *Miller* v. *Alabama*, supra, 132 S. Ct. 2460. *Miller* is the only one of the three decisions that does not impose a categorical bar, and instead merely implements a procedural limit on the imposition of life without the possibility of parole. Id. The rule in *Miller* applies to the smallest subset of juveniles affected by the trilogy—juvenile homicide offenders. As I explain in this dissenting opinion, the rule affects only one type of punishment, the mandatory imposition of a sentence of life without the possibility of parole. *Miller* represents the smallest step taken in the trilogy, and the court's desire to keep its footprint small is justified considering that *Miller* governs only the worst group of juvenile offenders, those who have committed homicides.

The very cautious, incremental approach that the court has taken in applying the principle that children are different for sentencing purposes supports the conclusion that in both *Graham* and *Miller*, when the court limited its holding to sentences of life without the possibility of parole, it meant what it said. A sentence of life without the possibility of parole is one that ensures that a defendant will die in prison. Extending the scope of these two decisions to apply to sentences that are the "functional equivalent" of life without the possibility of parole ignores the structured and considered approach that the court has taken in the trilogy of cases.

The substantive analysis in *Graham* does not support applying either *Graham* or *Miller* to sentences for a lengthy term of years. I begin with what is undisputed: *Graham* and *Miller* govern the same punishment. The majority and I disagree, however, on precisely what that punishment includes. I conclude that the punishment

governed by both cases is a sentence of life without the possibility of parole; the majority contends that both cases also govern sentences for a lengthy term of years. Because *Graham* and *Miller* govern the same punishment, the court's analysis in *Graham* is relevant to our understanding of whether *Miller* properly may be extended to include sentences for a lengthy term of years.

It is highly significant, therefore, that the court in *Graham* did not consider any nationwide statistics regarding the imposition of sentences for a lengthy term of years on juveniles. In *Graham*, the court explained that because it was adopting a categorical rule, it would follow its traditional approach: "The [c]ourt first considers objective indicia of society's standards, as expressed in legislative enactments and state practice to determine whether there is a national consensus against *the sentencing practice at issue*. . . . Next, guided by the standards elaborated by controlling precedents and by the [c]ourt's own understanding and interpretation of the [e]ighth [a]mendment's text, history, meaning, and purpose . . . the [c]ourt must determine in the exercise of its own independent judgment whether *the punishment in question* violates the [c]onstitution." (Citations omitted; emphasis added; internal quotation marks omitted.) *Graham* v. *Florida*, supra, 560 U.S. 61. In order to determine whether a particular practice violates the eighth amendment, thus requiring the imposition of a categorical bar, the court surveys the nationwide statistics *relating to the sentencing practice at issue*. The survey is part of the analysis—if the court has not performed the survey, it has not made any determination that the sentencing practice violates the eighth amendment.

Accordingly, in order to determine whether *Graham*, and therefore *Miller*, properly may be extended to sentences for a lengthy term of years, one need only examine the court's review of the "sentencing practice at issue" in *Graham*. Id. A quick review of *Graham* reveals that the court did not include sentences for a lengthy term of years in its review of the nationwide statistics. Id., 62–67. Because the court was very careful to state that its determination of whether the eighth amendment categorically bars a "sentencing practice" depends on this review, it is illogical to extend *Graham* beyond the sentencing practice for which the court performed the review. The majority provides no explanation for its conclusion that *Graham*, and therefore *Miller*, apply to sentences for a lengthy term of years, notwithstanding the Supreme Court's failure to review any statistics regarding the imposition of such sentences on juveniles. The majority simply concludes that, as a matter of policy, *Graham* should be extended to include these sentences. That approach omits a key analytical foundation that the Supreme Court has followed in decisions imposing categorical bars, including *Graham*.

The language of both *Graham* and *Miller* confirms that the court confined the scope of those decisions to sentences of life without the possibility of parole. In *Graham*, for instance, the court likened the sentence of life without the possibility of parole to the death penalty, observing both that "life without parole is the second most severe penalty permitted by law," and that "life without parole sentences share some characteristics with death sentences that are *shared by no other sentences*." (Emphasis added; internal quotation marks omitted.) *Graham* v. *Florida*, supra, 560 U.S. 69. Neither of these two statements makes sense if we read *Graham* and *Miller* to extend to sentences that are the "functional equivalent" of life without the possibility of parole. Clearly, the Supreme Court views the two sentences—execution and life without the possibility of parole—as distinct from all other available punishments within our criminal justice system. The court explained: "The [s]tate does not execute the offender sentenced to life without parole, but the sentence alters the offender's life by a forfeiture that is irrevocable. It deprives the convict of the most basic liberties without giving hope of restoration, except perhaps by executive clemency—the remote possibility of which does not mitigate the harshness of the sentence. . . . [T]his sentence means denial of hope; *it means that good behavior and character improvement are immaterial*; it means that whatever the future might hold in store for the mind and spirit of [the convict], *he will remain in prison for the rest of his days*." (Citation omitted; emphasis added; internal quotation marks omitted.) Id., 69–70. These statements clarify that the court defined the sentence that it was addressing in *Graham*, and subsequently in *Miller*, very narrowly, to include only a sentence of life without the possibility of parole. A sentence for a lengthy term of years, such as the fifty year sentence that the petitioner in the present case received, albeit a harsh punishment, does not even remotely fit the description in *Graham* of a sentence of life without the possibility of parole. As one court explained, a sentence of life without the possibility of parole, unlike a sentence for a term of years, is by definition "mutually exclusive with eventual release." *Ellmaker* v. *State*, Docket No. 108,728, 2014 WL 3843076, *10 (Kan. App. August 1, 2014) (decision without published opinion, 329 P.3d 1253 [Kan. App. 2014]).

The language used in *Miller* confirms that the court carefully limited the extent of its holding to sentences of life without the possibility of parole. In the introductory portion of the opinion, the court indicated that it viewed the phrase "life without the possibility of parole" as synonymous with a sentence that ensures that a defendant will die in prison. That is, the court specifically remarked that in each of the two cases that it had before it, the sentencing authority had no discretion to impose less than "life imprisonment without the possibility of

parole," which, the court explained, meant that in both cases, "[s]tate law mandated that each juvenile die in prison . . . ." *Miller* v. *Alabama*, supra, 132 S. Ct. 2460. The court subsequently referred to the sentence as the "harshest possible penalty" that can be imposed on juveniles. Id., 2469. The use of the superlative indicates that the court had in mind a single sentence—life without the possibility of parole—not a range of sentences that could be interpreted to constitute the "functional equivalent" of a sentence of life without the possibility of parole. The court in *Miller* reiterated a very telling observation that it first expressed in *Graham*, noting that a life sentence is actually a greater punishment for a juvenile than it is for an adult, because the juvenile likely will spend a longer time in prison. Id., 2468; see also *Graham* v. *Florida*, supra, 560 U.S. 70. That comparison would not have the same meaning, and the likelihood of a juvenile serving more time than an adult would decrease, if *Miller*, and *Graham*, were extended to apply to sentences for a lengthy term of years.

Reading *Miller* broadly, to apply to sentences for a lengthy term of years, is not only contrary to the structure and language of the court's juvenile sentencing trilogy, as conceded by the majority, it also results in the unpredictable and inconsistent application of the protections of *Miller*. This is, in fact, precisely what has happened across the country, due to several factors, including a split as to whether *Graham* and *Miller* apply at all to such sentences, disagreement as to whether the decisions apply to aggregate sentences, and the different conclusions that courts have arrived at as to what precisely constitutes the functional equivalent of a life sentence. See, e.g., *Bunch* v. *Smith*, 685 F.3d 546, 551 (6th Cir. 2012) (*Graham* does not apply to eighty-nine year aggregate sentence, notwithstanding that defendant's "sentence may end up being the functional equivalent of life without parole"), cert. denied sub nom. *Bunch* v. *Bobby*, U.S. , 133 S. Ct. 1996, 185 L. Ed. 2d 865 (2013); *Orr* v. *United States*, Docket No. 3:98-CR-00322 (GCM), 2013 U.S. Dist. LEXIS 173101, *6 (W.D.N.C. December 10, 2013) (forty-six year sentence not functional equivalent of life without possibility of parole); *People* v. *Caballero*, 55 Cal. 4th 262, 267–68, 282 P.3d 291, 145 Cal. Rptr. 3d 286 (2012) (110 year sentence is functional equivalent of life without parole under *Graham*); *People* v. *Lucero*, Docket No. 11CA2030, 2013 WL 1459477, *1, 3 (Colo. App. April 11, 2013) (*Graham* does not apply to sentence of eighty-four years with parole eligibility after forty years), cert. granted, Docket No. 13SC624, 2014 WL 7331018 (Colo. December 22, 2014); *Mediate* v. *State*, 108 So. 3d 703, 706–707 (Fla. App. 2013) (*Graham* does not apply to 130 year aggregate sentence); *Thomas* v. *State*, 78 So. 3d 644, 646 (Fla. App. 2011) (*Graham* does not apply to concurrent sentences of fifty years); *Brown* v. *State*, 10 N.E.3d 1, 8 (Ind. 2014) (*Miller* applies to sentences

that are functional equivalent of life, and requires court to revise aggregate sentence of 150 years to "a total aggregate sentence of eighty years imprisonment"); *State* v. *Null*, 836 N.W.2d 41, 71 (Iowa 2013) (recognizing that defendant's sentence of fifty-two and one-half years is "not technically a life-without-parole sentence" but holding that "such a lengthy sentence imposed on a juvenile is sufficient to trigger *Miller*-type protections"); *Ellmaker* v. *State*, supra, 2014 WL 3843076, *10 (*Miller* does not apply to sentence of fifty years not imposed pursuant to mandatory sentencing scheme). This uneven application of *Miller* cannot be reconciled with eighth amendment principles.

It is highly problematic, indeed, for courts to rely on concepts such as life expectancy, as the majority has in the present case, in order to determine whether a sentence for a lengthy term of years constitutes the functional equivalent of a sentence of life without the possibility of parole. How does one determine what a juvenile's life expectancy is? Like other courts across the country, the majority relies on mortality tables, which are traditionally broken down by gender and race. See, e.g., *Orr* v. *United States*, supra, 2013 U.S. Dist. LEXIS 173101, *7; *People* v. *Rainer*, Docket No. 10CA2414, 2013 WL 1490107, *6 (Colo. App. April 11, 2013), cert. granted, Docket No. 13SC408, 2014 WL 7330977 (Colo. December 22, 2014); *State* v. *Ragland*, 836 N.W.2d 107, 119 (Iowa 2013); see also *People* v. *Caballero*, supra, 55 Cal. 4th 267 n.3 (relying on juvenile's natural life expectancy, which court observes "means the normal life expectancy of a healthy person of [the] defendant's age and gender living in the United States"). Relying on such classifications in order to determine whether a given sentence violates the eighth amendment suggests that a Caucasian girl should be treated differently than an African-American boy.

The majority also relies on statistics that demonstrate that a person who is incarcerated has a lower life expectancy than that enjoyed by the general population. I observe that the majority relies on statistics supplied by The Campaign for the Fair Sentencing of Youth, an advocacy group. See Campaign for the Fair Sentencing of Youth, "Michigan Life Expectancy Data for Youth Serving Natural Life Sentences," (2012–2015) p. 2, available at http://fairsentencingofyouth.org/wp-content/uploads/2010/02/Michigan-Life-Expectancy-Data-Youth-Serving-Life.pdf (last visited May 26, 2015). Additionally, a consideration of demographic factors and their influence on life expectancy is problematic because there are many variables, rendering it difficult to predict the effect that a single variable will have on any particular juvenile. For instance, is it not relevant, in considering the effect that incarceration has on the relative life expectancy of a juvenile, to consider that juvenile's background? Although incarceration may lower the life expectancy for an advantaged juvenile,

it very well may increase the life expectancy of a juvenile who comes from a disadvantaged economic class and background. See *Boneshirt* v. *United States*, Docket No. CIV 13-3008 (RAL), 2014 WL 6605613, *11 (D.S.D. November 19, 2014) (rejecting petitioner's reliance on statistics demonstrating short life expectancies for Native American males on basis that many demographic variables resulting in lower life expectancy, such as "alcohol-related deaths and poor access to healthcare on and near reservations," would be mitigated by petitioner's incarceration). I do not agree that our application of eighth amendment protection to juveniles should vary depending on race, gender and demographic factors. Such a rule violates principles of fundamental fairness.

Finally, I observe that the majority's rule is not reconcilable with General Statutes § 53a-35b, which defines the sentence of life without the possibility of release in a manner that makes it clear that our legislature understands that sentence to be fundamentally distinct even from a life sentence. Section 53a-35b provides: "A sentence of life imprisonment means a definite sentence of sixty years, unless the sentence is life imprisonment without the possibility of release, imposed pursuant to subparagraph (A) or (B) of subdivision (1) of section 53a-35a, in which case the sentence shall be imprisonment for the remainder of the defendant's natural life." As Justice Zarella observes in his dissent in the present case, it is well established that this court defers "to the broad authority that legislatures possess in determining the types and limits of punishment for crimes." *State* v. *Heinemann*, 282 Conn. 281, 311, 920 A.2d 278 (2007); see also *State* v. *Reynolds*, 264 Conn. 1, 79, 836 A.2d 224 (2003) (recognizing that it is "the prerogative of the legislature to set public policy through its statutory enactments"), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004). Accordingly, at the very least, even if I agreed with the majority that *Miller* should be extended to sentences for a lengthy term of years, our legislature has drawn a clear line, designating sixty years as the length of time it deems to constitute a "life" sentence. The majority offers no explanation for its failure to defer to the legislature's determination that a sentence of life without the possibility of parole is a punishment of a different type and character from a sentence for a lengthy term of years.

For the foregoing reasons, I respectfully dissent.

————————————————